(229 P.3d 402)
No. 99,213

STATE OF KANSAS, *Appellee*, v. KARL BOWLIN, *Appellant*.

Opinion filed April 30, 2010.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, for appellant.

*Kristiane Gray*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, for appellee.

Before LEBEN, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Karl Bowlin appeals from his bench trial conviction and sentence for involuntary manslaughter in violation of K.S.A.

21-3404. In addition, Bowlin appeals from the trial court's judgment denying his ineffective assistance of counsel claims after an evidentiary hearing. Bowlin first argues that his trial counsel was ineffective in not moving to suppress his statements made during a police interrogation. We agree with Bowlin's argument. The appellate record in this case establishes that there were two good bases for suppressing Bowlin's interrogation statements—that Bowlin's statements were involuntary based on overreaching police conduct and based on Bowlin's assertion of his right to counsel under the Fifth Amendment to the United States Constitution. Because the suppression of Bowlin's interrogation statements would have dealt a serious, if not fatal, blow to the State's case against Bowlin, we are unable to dismiss the decision by defense counsel to not seek suppression of Bowlin's statements as trial strategy. We determine that defense counsel's conduct in not moving for suppression of Bowlin's interrogation statements, and in actually stipulating to the admission of the interrogation tape into evidence at trial, was deficient and that Bowlin was prejudiced by such conduct.

Bowlin also contends that the State presented insufficient evidence for the trial court to convict him of involuntary manslaughter. Although we are reversing and remanding for a new trial, we must also address Bowlin's sufficiency of the evidence argument to determine whether retrial is permissible under the Double Jeopardy Clause. After reviewing all of the evidence, in the light most favorable to the State, we are convinced that a rational factfinder could have found Bowlin guilty beyond a reasonable doubt.

Because we are reversing and remanding for a new trial, we need not address Bowlin's other arguments concerning his ineffective assistance of counsel claims and the trial court's use of criminal history to increase his sentence. Accordingly, we reverse Bowlin's conviction for involuntary manslaughter and remand for a new trial.

Bowlin's conviction in this case is based on the death of an 8-year-old girl, Jewell Morse, who died as a result of a house fire on the evening of July 2, 2006. Two fire investigators, who conducted independent investigations, were able to eliminate several accidental causes of fire, including a gas fire and an electrical fire, but they

were unable to determine the actual cause of the fire. The fire investigators were able to determine that the fire had started in the basement of the house around a table where paint thinner had spilled, and had quickly spread upstairs to the rest of the house.

During the fire investigations, a Black Cat wrapper was found in a back bedroom of the DeMotte house. Nevertheless, according to fire investigator John Paul Jones, the residents of the DeMotte house said they had run out of fireworks, and the boy who lived in that bedroom was in a juvenile detention facility when the fire occurred.

On July 4, 2006, 2 days after the fire, Detective Michaels, along with Detective Randy Slater, fire investigator Jones, and fire investigator Jim Long, interrogated Bowlin. According to Long, when they met with Bowlin, they had received reports from other people in the neighborhood that Bowlin had been throwing M-80's on the evening in question. During the 3-hour and 11-minute interview, Bowlin stated that one of his bottle rockets might have gotten away from him and started the fire.

At the end of the interview, Bowlin stated that he had shot a rocket on a thicker stick that had hit the house and might have gone down and landed inside the house. Bowlin stated that he thought the rocket might have been what went inside the house and started the fire. Bowlin stated that they might have been throwing M-80's before or right after he shot the rocket.

The State charged Bowlin with first-degree felony murder under K.S.A. 21-3401 based on the underlying felony of aggravated arson. Alternatively, the State charged Bowlin with second-degree reckless murder in violation of K.S.A. 21-3402. The State also charged Bowlin with aggravated arson in violation of K.S.A. 21-3719. After preliminary hearing, the trial court bound Bowlin over for trial on all of the charged counts.

At a pretrial motions hearing, Bowlin's attorney stated that he was not going to move to suppress Bowlin's statements from the police interrogation on July 4, 2006, and he stipulated to the voluntariness of the statements.

The State amended the complaint to charge Bowlin with second-degree reckless murder. The first-degree felony murder and ag-

gravated arson charges were dismissed. The State's original theory had been that Bowlin had thrown an M-80 towards the DeMotte house and that it had entered the house and started the fire. Nevertheless, after preliminary hearing, the State changed its theory to argue that Bowlin had thrown a dangerous illegal rocket in a residential area, that such conduct showed a disregard for the value of the human lives in that location, and that the illegal firework had gone in the DeMotte house and started the fire.

Bowlin waived his right to a jury trial, and the case proceeded to a bench trial. At trial, Tina Hodge, who was Bowlin's girlfriend and roommate, testified that she had been with Bowlin before the house fire started on July 2, 2006. According to Tina, several people, including Bowlin, Terry Miller, Nino Morse, Bowlin's niece Gina, and Gina's children, were shooting off fireworks in the alley outside her house that evening. Tina testified that there were bottle rockets (maybe larger ones), Saturn missiles, and firecrackers there that evening. Tina testified that Marcus Morse, Terry Morse, and Jeff Miller were also there that evening, but Terry Morse left at some point in the evening. Tina testified that there were people all over the alley, at the nearby park, and also throughout the neighborhood shooting off fireworks that evening. Tina further testified that she heard bottle rockets, M-80's, and firecrackers throughout the evening.

Matthew Morse, who was one of Dawn DeMotte's sons, also testified that many fireworks, including bottle rockets and little dynamites, were being set off in the neighborhood on the night of July 2, 2006.

Tina testified that before the fire started that evening, Bowlin and his group ran out of fireworks, and she and Gina left to get more. According to Tina, Bowlin's group was sitting around and not shooting off any fireworks when she left. Tina did not arrive back at the scene until after the fire had started.

Terry Miller, who was Tina's uncle, testified that no one in their group had any M-80's or larger bottle rockets. Miller further testified that no one shot anything towards the DeMotte house. According to Miller, they had shot off all of their fireworks and were

waiting for Tina and Gina to bring them more fireworks when the DeMotte house went up in flames.

Jewell's mother, Dawn DeMotte, testified that Robert Garrison, who was living in the garage behind her house, woke her up on the evening of July 2, 2006, and got her out of the house fire. Garrison and all of DeMotte's other children, except for Jewell, were able to get out of the house safely.

DeMotte testified that before she had moved into the house, it had previously caught on fire, but Bowlin and her previous boyfriend, Adam, had helped fix it up. DeMotte testified that after Adam had moved out of her house, she and Bowlin were not friends and there had been some hard feelings between them. Nevertheless, DeMotte testified her children would play with Bowlin, and they had been shooting bottle rockets at each other across the alley on the Friday before the fire. According to DeMotte, although the boys were mad when they were initially shooting bottle rockets at each other, it turned into a "ha-ha kind of" situation.

Two days after the fire, while at the hospital, Robert Garrison told a detective and a fire investigator that Bowlin had been throwing M-80's and had been yelling statements like, "I'll show you guys," and, "I'm gonna get you guys," on the evening of July 2, 2006. Nevertheless, at preliminary hearing, Garrison testified that he did not see Bowlin throwing any fireworks or igniting them towards the house directly. Moreover, when questioned by the prosecutor whether Bowlin had said anything, Garrison testified, "[N]ot that I recall."

At trial, however, Garrison changed his story again and testified that he could see Bowlin shooting some sort of rockets towards DeMotte's house on the evening of July 2, 2006. According to Garrison, he heard a loud explosion that evening when he was in Dawn's house. Garrison testified that when he got up and looked outside, he saw Bowlin and other people shooting off fireworks. According to Garrison, a short time later, he saw smoke coming out of the basement. Garrison further testified that there were a lot of fireworks going off that night, including M-80's, bottle rockets, and firecrackers, but he did not see anyone else shooting fireworks in the direction of DeMotte's house.

Terry Morse testified that when he talked with his nephew, Nino Morse, shortly after the fire, Nino told him that Terry Miller was saying that Nino had started the fire. Nino then told Terry Morse that Bowlin had caused the fire. Nino told Terry Morse that Bowlin lit a bottle rocket and said, "[H]ere's how a professional does it" and then threw it. Nino told Terry Morse that he saw the rocket go inside the DeMotte house. Nino further stated to Terry Morse that he and Bowlin ran over to a tree and watched as the fire started. When questioned at trial about why neither he nor Nino went to the police about Bowlin's involvement in the house fire, Terry Morse stated that both he and Nino had warrants out for their arrest at that time. Although Terry Morse and Nino Morse told Jewell's father, Patrick Morse, about Nino's version of events, Patrick Morse did not go to the police with this information.

Approximately 3 months after the fire and after the preliminary hearing, Dawn DeMotte told fire investigator Jones that she had heard that Nino Morse had told Patrick Morse some information about the fire. Upon being interviewed, Nino initially told Jones that a firework thrown by Bowlin had gone inside the house. Nevertheless, when questioned further about whether it went in the house, Nino told Jones that the firework did not go in the house but that it hit by the base of the house. Nino then told Jones that he could not really see the firework hit and that it just "kind of went over by the base." Nino said that he had been smoking marijuana all day on July 2, 2006.

At trial, Nino testified that he had been drinking since he woke up on the morning of July 2, 2006, and that "[t]hose are drunken memories." Nino further testified that he smoked a quarter of an ounce of marijuana on the morning of July 2, 2006. According to Nino, he could not be very sure about exactly what happened during the incident in question because he was "pretty high and pretty drunk."

Nino testified that he, Bowlin, and Terry Morse were drinking on the evening of July 2, 2006, and shooting off fireworks, like Black Cats and 9-inch bottle rockets. Nino testified that he had told Terry Morse and Patrick Morse, who was Jewell's father, that he had seen Bowlin shoot a large bottle rocket, that he had seen

the rocket fly towards the left side of the DeMotte home, and that he thought it had caused the fire. During his testimony, Nino denied that Bowlin ever broke the stick off the firework or that Bowlin had said anything like, "this is how a professional does it," before he shot the firework. According to Nino, when the firework went off, he and Bowlin jumped in the gate of his truck and watched to make sure that nothing caught on fire. Nino testified that they saw no smoke or fire, so they continued what they were doing.

According to Nino, no more than 10 minutes after Bowlin shot the rocket, they noticed that the DeMotte house was on fire. Nino testified that during those 10 minutes, everyone in the neighborhood was lighting off fireworks and that there were a lot of big explosions.

At the conclusion of the bench trial, the trial court found Bowlin guilty of the lesser offense of involuntary manslaughter. After the bench trial, the trial court allowed Daniel Cahill to withdraw as Bowlin's counsel because Bowlin believed that Cahill had been ineffective. The trial court appointed new counsel for posttrial motions and sentencing.

Bowlin moved for a new trial and argued that his attorney had been ineffective in failing to call witnesses in Bowlin's behalf and in improperly persuading Bowlin to waive a jury trial. After hearing the parties' arguments and testimony from Cahill, the trial court denied Bowlin's ineffective assistance of counsel claims. The trial court then sentenced Bowlin to 57 months in prison.

On appeal, this court remanded the case to the trial court for an additional hearing on Bowlin's ineffective assistance of counsel claims. By the time of the remand hearing, Cahill had been appointed as a judge in Wyandotte County District Court, the same district court where the remand hearing was being held, and had been assigned to the child in need of care court.

Additional ineffective assistance of counsel claims presented at the remand hearing involved Cahill's failure to move to suppress Bowlin's interrogation statements and Cahill's failure to move for another preliminary hearing after the judge made biased statements. After hearing testimony from both Cahill and Bowlin at the remand hearing, the trial court found that Bowlin had not met the

first prong of the test for ineffective assistance of counsel and denied his claims.

*Ineffective Assistance of Counsel*

On appeal, Bowlin first argues that, by his defense counsel's conduct, he was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. Bowlin points to the following alleged improper conduct by his defense counsel: (1) introducing Bowlin's highly prejudicial interrogation statement into evidence and failing to suppress the statement; (2) failing to present witnesses on Bowlin's behalf, including potential defense witnesses and a fire expert; (3) failing to challenge the trial judge's ruling from the preliminary hearing when the judge made biased comments before making his ruling; and (4) advising Bowlin to waive his right to a jury trial.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009).

To merely surmise with the benefit of hindsight, that another attorney may have tried the case differently is insufficient. Rather, before counsel's assistance is determined to be so defective as to require reversal of a conviction, the defendant must establish two things. First, the defendant must establish that counsel's performance was constitutionally deficient. This requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that counsel's deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential and requires consideration of the totality of the evidence before the judge or jury. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. To establish prejudice, the defendant must show a reasonable probabil-

ity that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Harris*, 288 Kan. at 416.

### Admission of Bowlin's Interrogation Statements

Bowlin maintains that his defense counsel was deficient in not attempting to suppress his incriminating interrogation statements, in which he took responsibility for starting the fire, and in actually introducing the statements into evidence at trial. Bowlin contends that there were two independent bases for suppressing his statements: (1) Bowlin was denied his right to counsel during the interrogation; and (2) his statements were involuntary.

### Assertion of Right to Counsel

Bowlin maintains that during his police interrogation, he asserted his right to an attorney under the Fifth Amendment to the United States Constitution and, therefore, any statements made after that assertion should have been suppressed.

Specifically, after 2 hours of interrogation, Bowlin told the interrogators that he thought he was going to have to get a lawyer:

Bowlin: "I think I'm going to have to get a lawyer."
Officer: "Get a lawyer. Get a lawyer."
Bowlin: "What else can I do, I am going to jail anyway?"
Officer: "It doesn't make a difference if you go to jail. It's how you're charged that you need to worry about. And I tell you what, your lawyer—"
Bowlin: "I don't know what to do, man."
Officer: "Okay, let's slow it down."

Bowlin's statement—"I think I'm going to have to get a lawyer"—has been found to be ambiguous or equivocal. See *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997) ("I think I need an attorney.").

Nevertheless, a moment later, the interviewing officer returned to Bowlin's earlier request for an attorney and asked Bowlin a clarifying question to determine whether Bowlin desired to have counsel present:

Officer: "Do you need a lawyer?"
Bowlin: "Yeah."
Officer: *"Fucking-A right you need a lawyer."* (Emphasis added.)

The interviewing officer deflected Bowlin's request for an attorney with this misrepresentation:

Officer: "But you know what your lawyer's going to tell you to do? Don't say shit. Fuck 'em. Don't say shit. Let's go to trial. And when we go to trial, this is what you're looking to fight."

After stating that Bowlin's trial would be held approximately 8 or 9 months in the future, the interviewing officer emphasized to Bowlin that he was going to lose his chance to tell his side of the story:

Officer: "When that day comes by, you know what I always take pleasure in telling people. Once I leave the courtroom, I am going to look you in the eye and you will know that I have given you the opportunity to tell your side of the story before we went to all this. Alright."
Bowlin: "What I have been trying to tell you."
Officer: "Yeah, you have been trying to tell me a pack of lies."
Bowlin: "That's what happened."
Officer: "That's not what happened. That's not what happened."

Several minutes later, Bowlin again told the officers that he needed an attorney:

Officer 1: "Detective Lane wants to know if you'd be willing to take a lie detector test on your testimony?"
Bowlin: *"Yeah, as soon as I get my lawyer and all."*
Officer 1: "He wants a lawyer first. But, you'll take one?"
Bowlin: "Yeah."
Officer 1: "Okay."
Officer 2: *"Are you saying you want a lawyer right now?"*
Bowlin: *"I need one, I can't just sit here. I need a lawyer."*
Officer 2: "Okay, so—"
Officer 1: (undiscernable)
Bowlin: *". . . I want one because what am I supposed to do?"* (Emphasis added.)

Statements similar to those of Bowlin have been determined by courts to be an unambiguous and unequivocal request for counsel. See *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) ("Can I get an attorney right now, man?"); *State v. Harris*, 741 N.W.2d 1, 7 (Iowa 2007) ("We're going to do it with a lawyer. That's the way I got to go."); *Com. v. Hilliard*, 613 S.E.2d 579, 586 (Va. 2005) ("Can I get a lawyer in here?").

Instead of stopping the questioning and allowing Bowlin to call an attorney, the officers continued questioning Bowlin about whether he wanted to stop talking to them:

Officer 2: "So, are we done then? You don't want me to ask any more questions?"
Officer 1: (undiscernable) "I think we're going to 10-15 minutes."
Bowlin: "I don't mind that. I just—you aren't believing anything I say."
Officer 2: "I told you what—I'm sitting here trying to understand your point of view."

The officers continued questioning Bowlin for several minutes and then leg-shackled him nearly 2½ hours into the interview. After leg-shackling him, one of the interviewing officers asked Bowlin to clarify his earlier request for an attorney:

Officer 2: "And we were at the point, at this time, you expressed an interest in wanting a lawyer, is that correct?"
Bowlin: *"It looks like I'm going to need one."*
Officer 2: "Well, I understand, you'll need one. But, at this time, do you want to continue talking or do you want to stop?"
Bowlin: "Well, we're waiting on Jeff to come in, ain't we?"
Officer 2: *"So, you want to put everything on hold until Jeff comes in?"*
Bowlin: *"Yeah. Hell, I'm shaking. Hell, I don't even know what to say."*
Officer 2: "I've just got to be clear. I just need this cleared up. You still want to talk to us at this time?"
Bowlin: "Yeah."
Officer 2: "Okay." (Emphasis added.)

At the remand hearing on his ineffective assistance of counsel claims, Bowlin testified about his requests for an attorney during his interrogation as follows:

"[Bowlin:] I said, well, I think I need an attorney. They're saying, well they just acted like they didn't care. It wadn't I had no rights, you know. It was just like, hey, you're gonna talk to us.
"[Bowlin's attorney:] Did they get you an attorney at that time?
"[Bowlin:] No.
"[Bowlin's attorney:] Did they continue to question you even though you asked for an attorney?
"[Bowlin:] They kept questioning.
"[Bowlin's attorney:] Why did you keep talking to them, Karl, if you wanted an attorney, but they didn't give you an attorney?
"[Bowlin:] I was scared. I didn't know what to do. I'd asked for an attorney three or four times and, you know, if that's your rights to ask for an attorney, then

they didn't give me one, what was I what was I to think? I mean, I was under their control."

Bowlin also testified at the remand hearing about how the officers were intimidating and did not honor his request for an attorney:

"[Bowlin's attorney:] Okay. [Were you] [i]n any way intimidated by the language they were using to you?

"[Bowlin:] Without a doubt.

"[Bowlin's attorney:] And how did that affect why you continued to talk to them after asking for an attorney?

"[Bowlin:] Yeah. I mean, I tried to ask for an attorney. Theythey didn't want to honor it. I justyou know, I didn't know what to do.

"[Bowlin's attorney:] Did you feel you had any option to stop then even though they hadn't gotten you an attorney?

"[Bowlin:] No. I justwell, I asked. They didn't give me one. I'm bound to talk. That was it."

The State asserts that Bowlin's right to counsel under the Fifth Amendment to the United States Constitution was not violated because Bowlin never made an unambiguous request to cease the interview and speak with an attorney.

Our Supreme Court in *State v. Walker*, 276 Kan. 939, 944-45, 80 P.3d 1132 (2003), held that invocation of the Fifth Amendment right to counsel, which is protected by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), "may be asserted at any time and 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.' [Citation omitted.]" This assertion of the Fifth Amendment right to counsel has two aspects: (1) the suspect must articulate his or her desire to have an attorney present sufficiently clearly so that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney; and (2) the request must be for assistance with the custodial interrogation, not for later hearings or proceedings. *Walker*, 276 Kan. at 945.

Quoting from *McNeil v. Wisconsin*, 501 U.S. 171, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991), our Supreme Court recently stated that once a suspect invokes the Fifth Amendment right to counsel,

" 'not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him" [citation omitted],—which means . . . that counsel must be present [citation omitted]. If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights" [citation omitted].' " *State v. Appleby*, 289 Kan. 1017, 1045, 221 P.3d 525 (2009).

When a defendant argues that he or she requested the assistance of an attorney, the timing and the content and context of a reference to counsel may help determine whether there has been an unambiguous assertion of the right to the assistance of an attorney in dealing with a custodial interrogation by law enforcement officers. *Appleby*, 289 Kan. 1017, Syl. ¶ 13.

Although under *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), an officer is not required to ask clarifying questions to ambiguous post-*Miranda* statements, the *Davis* Court recognized that it was "good police practice" for interviewing officers to seek clarification of suspects' ambiguous or equivocal reference to an attorney. Clarifying questions protect the suspects' rights by ensuring that they get an attorney when they want one and minimizing later judicial second-guessing as to whether the suspects were actually invoking their right to counsel. 512 U.S. at 461.

Once the interviewing officer sought clarification of Bowlin's equivocal request—"I think I'm going to have to get a lawyer"—the officer could not ignore or deflect Bowlin's affirmative answer to the officer's question: "Do you need a lawyer?" At that point, clarification occurred. Nevertheless, instead of acknowledging Bowlin's affirmative answer to the officer's question,—"Do you need a lawyer?"—the officer deflected Bowlin's affirmative answer. Moreover, the officers used this opportunity to tell Bowlin that his chance to cooperate would never be better than it was that day because the next morning, they were going to present all the evidence that they had gathered against him to the district attorney.

In this case, there can be no doubt that the officers understood that Bowlin had made a request for an attorney for assistance with the custodial interrogation. After Bowlin's equivocal statement, "I think I'm going to have to get a lawyer," the interviewing officer sought clarification of Bowlin's statement, received an affirmative response from Bowlin that he did need an attorney, and even went so far as to agree with Bowlin that he needed an attorney. Several minutes later, another interviewing officer further clarified that Bowlin wanted a lawyer "right now" during the custodial interrogation. Nevertheless, the officers did not cease Bowlin's interrogation and honor his request for counsel. Rather, the officers continued questioning and badgering Bowlin until 23 minutes after his first request for counsel, and after his legs had been shackled, he agreed that he still wanted to talk with the officers.

Because the police officers chose not to honor Bowlin's assertion of his Fifth Amendment right to counsel, any statements made by Bowlin after his request for an attorney were involuntary and inadmissible at trial. As Bowlin points out, his most damaging statements in which he admitted that his rocket had hit the house and might have gone down inside the house and started the fire were all made after he asserted his Fifth Amendment right to counsel.

*Involuntariness of Statement*

Bowlin also argues that his trial attorney was ineffective for failing to move for suppression of his statements on the basis that they were involuntary.

In determining whether a statement is voluntary, courts look at the totality of the circumstances. *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007). Our Supreme Court has recently set forth a nonexclusive list of factors to be considered, which include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009).

In describing the weight to be given to the individual factors, our Supreme Court, citing *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988), has stated as follows:

" '[T]hese factors are not to be weighed against one another on a balance scale, with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act. [Citation omitted.]' [Citation omitted.]" *Sharp*, 289 Kan. at 81.

Thus, the essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the accused's free and independent will. *State v. Swanigan*, 279 Kan. 18, 23-24, 106 P.3d 39 (2005). " 'Coercive police activity is a necessary predicate to the finding that a confession is not voluntary.' *Colorado v. Connelly*, 479 U.S. 157, 167, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986)." *State v. Sharp*, 289 Kan. 72, 80-81, 210 P.3d 590 (2009). The United States Supreme Court has used a "coerced confession" interchangeably with an "involuntary" confession. See *Arizona v. Fulminante*, 499 U.S. 279, 288, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991). As a result, coercion can include inducement by promise, as well as by threat. *Sharp*, 289 Kan. at 81.

Bowlin maintains that his interrogators unduly pressured him to state that he had started the fire. Bowlin contends that despite his repeated protests of innocence, the two detectives and the two fire investigators repeatedly told him that he was the one responsible for the fire, and he eventually relented to their demands and confessed.

Indeed, the recorded interrogation, which lasted 3 hours and 11 minutes, demonstrates that the officers' whole intent during the interrogation was to wear Bowlin down until they got him to admit that he had thrown M-80's towards the DeMotte house and that an M-80 he had thrown had caused the fire.

Early on in the interview, as it became clear to the detectives that Bowlin was not going to confess that he had caused the fire,

the detectives centered on a theme that Bowlin would be charged with a much harsher offense unless he went along with their theory in the case:

Michaels: "What I'm trying to get you to understand, Karl, is you can play this however you want. But what I don't want you to play it out is this and say hey, you know what, y'all have got me fucked up, that ain't my work. Because what's going to happen is now you're going to be leaving us with little to no choice at all to say man, that's a cold-blooded mother fucker. And then you're going to end up being charged with something that I don't think that you did intentional."
Bowlin:   "I didn't."

Later, when Bowlin stated that it would be crazy to throw M-80's at someone's house, the interrogating officer told Bowlin that was why he needed to admit it was an accident:

"You know what? You're right. It's fucking crazy. But what I'm trying to get you to understand is that's how a judge and a jury is going to look at this, it's fucking crazy. Now, you know what you need to do? Damage control, and this is how we go about it. Sure, I was back there shooting fireworks. Everybody in the fucking neighborhood knows me."

As Bowlin continued to deny that his firework had caused the fire, the interviewing officer indicated that he would never believe Bowlin:

"*But what I'm trying to get you to understand is not for a moment will I not believe that this is your work.* Because I have 7 independent witnesses that corroborate the same story that had no way of getting together and say, hey okay, this is the story." (Emphasis added.)

The interrogating officer continued to reference the seven witnesses, some of whom were children, that he allegedly had against Bowlin and told Bowlin that if he did not go along with the detectives' theory, then he could be charged with a higher offense. The interrogating officer went so far as to explain what he needed to hear from Bowlin:

"In the eyes of a jury, I'm just preparing you for this guy. When you put a little kid on the stand who don't want to be involved that's balling his eyes out and is going to have to point at a big motherfucker like you but has still got the balls and the backbone to say what they saw that's going to be a tough road for you to hold onto. And I'm telling you, if it were me, if these guys were giving me this scenario, I'm telling you what would happen to me, I'd say look, guys, I truly fucked up, it was stupid. I was throwing M-80's at the house, I didn't mean for

anything to happen. But when one of my shit got in there, I saw that it started smoking. I saw that the fire started. At that point, I didn't know what to do. I fucking freaked out. Okay. You know what that does? First of all, it at least tells me that you have some heart inside, some backbone, but you have some compassion for what went on here. Cause I'm telling you if you say that everybody here has got me fucked up, this ain't my work, you know what's going to happen? You're going to find yourself over there charged probably with a negligent homicide, okay, rather than maybe involuntary manslaughter, accidental homicide, I don't know all the fucking rankings of all this shit. But I'm telling you this is not the time to deny what 7 people fucking saw."

As Bowlin continued to protest his innocence and to deny that he had thrown an M-80 at the house, the detectives increased their coercive practices:

Officer: "Who determines guilt is the 12-person jury but what's going to happen is when the witnesses all identify you and say what they saw you throwing M-80's at this house. *Then, all of a sudden, an accident turns into well maybe he was pissed off at this cocksucker that, you know, threw an M-80 at his girlfriend two days ago and it's time for a little payback.*"

Bowlin: "Well, *it sounds like I'm already hung* the way you explain."

Officer: "No, what I'm trying to get you to understand is we're not there. We're not there. But you know what, Karl, you're not talking, you're not giving your side of the story. You know what I'm hearing? *I'm hearing this third-grade school yard bullshit that it wasn't me, that you've got the wrong guy.*"

Bowlin: "We were lighting fireworks. We were doing it."

Officer: "Karl, we're over that."

Officer: "*What I want to hear from you is,* okay . . . *I want you to realize I didn't mean anything by it, it was an accident, help me, help me through it. Because I know my fucking M-80's started the fire.* That's what I want to hear because that's what 7 people told me. That's what I want to hear. *I want your fucking heart of stone to soften up a little bit and say, hey, help me out detective— because it was a fucking accident. It was an accident. I didn't mean for it to happen. I didn't mean for anyone to get hurt. But, you know what, I threw an M-80 up there and before I know it, I said aw shit, because people said that you said that, and we know that your M-80 started that fire, Karl. We know that. You did. You did, Karl.*"

Officer: "Karl, what I'm trying to get you to understand is *you need to man up, balls and backbone and say look, Detective Michaels, you got me but it was a fucking accident. Everybody understands that. Everybody understands it's an accident.* I'm not trying to put you there. I'm telling you what 7 people, all with their own eyes, saw you do."

Officer: "I'm going to tell you what. *You stand in front of a fucking jury and a judge and 7 witnesses and you still deny this, man, they're going to hammer you . . . I'll be retired before you get out of the penitentiary.*"

Bowlin: *"I hear you."*

Officer: "On the flip side of that, *I'm telling you if I was sitting over there and I would be quiet. But once you smell this out and all the evidence points at me. You know what I'd say? Two words, two words, damage control."* (Emphasis added.)

As the interrogation progressed, the officers continued telling Bowlin that he had thrown the M-80 that had caused the fire, that it had been an accident, and that Bowlin needed to admit these things so he would not be convicted of a harsher crime. The interrogating officers used profanity throughout the interview and even resorted to yelling at Bowlin shortly after he asserted his right to an attorney. The interview was conducted by four people and, despite the fact that Bowlin had been cooperative, the officers decided to leg-shackle him nearly 2½ hours into the interview.

As discussed previously, although Bowlin repeatedly asserted his right to counsel under the Fifth Amendment to the United States Constitution, the interrogators would not honor his request. Instead, the interrogators indicated to Bowlin that he would not get another opportunity to tell "his side" of the story consistent with the interrogators' theory of the case. In essence, Bowlin had to choose between getting an attorney and risking being charged and convicted of a severe offense or cooperating with the police and obtaining a more favorable result.

Towards the end of the 3-hour and 11-minute interview, an officer, who allegedly had just met with Jeffrey, one of Tina Hodge's family members, called in on speakerphone. In continuing with the interrogators' theme, the officer stated:

Officer: "Jeffrey said that there was you, Terry, and two other guys; that Terry threw one M-80 that was up towards the street; that you threw one in the tall grass by the fence and then you threw one over the fence towards the house. He said it was an accident, that you guys freaked out after the fire started and that you all knew that the M-80 caused the fire. *This is your time. I mean, you've got your own family telling the truth. You're either going to screw yourself by lying and then get screwed."*

Bowlin: "I know."

Officer: *"Or you can tell the truth and you're still going to be in trouble but it's not going to be as bad. If you lie, it's going to look a lot worse.* Your own people's telling the truth on you."

Bowlin: "Well, whatever he says, he was there."

Officer: "Yeah, well, and we're going to get with the guy from Wichita. I mean, it's going to be locked down. You've got four or five other witnesses. You need to be a man and step up to the plate and tell the truth. It's going to be awful damn hard to do, it's going to be tough for you to do. You need to do it and get this over with. It ain't going to go away."

Bowlin: "I hear you."

Officer: "If you tell the truth, it's going to be a hell of a lot better on you. *I can promise you that. . . . Tina's cousin Jeffrey said that it was an accident. It was not intentional.* You weren't saying fuck those people I want their house to burn down. Because we've got a person that was saying you was talking shit while you were doing it. One of the witnesses was saying you was cussing and all kinds of shit. *This Jeffrey is saying that you wasn't cussing, you wasn't drunk, you'd been drinking but he said you wasn't drunk. And, uh, it was just a fucking accident. That the kid had thrown an M-80 at your old lady and you guys were playing around shooting bottle rockets at each other, and you was just fucking around. So, that's the bottom line.*"

Bowlin: *"I hear you."*

Officer: *"The ball's in your court. You need to tell these guys the truth, though, and get this over with. I'm telling you, it's going to be a lot better for you."*

Bowlin: "You just about heard it right there, didn't you?" (Emphasis added.)

As the interviewing officer was going over Jeffrey's alleged statement with Bowlin, Bowlin stated, *"I ain't going to argue because I know if I argue with that, it's going to be worse on me."* (Emphasis added.)

The unmistakable message by the interrogators was that if Bowlin refused to confess to their theory of the case, the result would be a harsher charge and conviction for Jewell's death in the house fire. Throughout the interrogation, the officers were not interested in what Bowlin had to say about the events surrounding the house fire. They were intent on getting Bowlin to tell them what they wanted to hear and to confess to his involvement in the house fire. This became even more evident when the interrogators denied Bowlin his Fifth Amendment right to counsel. As their tactics became harsher and the interrogation extended on for 3 hours, the interrogators were able to wear Bowlin down and get him to admit that he had caused the fire. Such tactics were coercive and constituted police overreaching.

A review of the lengthy interrogation that took place in this case leads this court to determine that Bowlin's will was overborne and

the overreaching police conduct was causally related to the confession. When looking at the totality of the circumstances, we find that Bowlin's statements were involuntary. Accordingly, the previously mentioned facts furnish another reason that requires the suppression of Bowlin's statements on July 2, 2006.

*Trial Counsel's Testimony*

At the remand hearing, Bowlin's defense counsel testified that he had reviewed the interrogation tape numerous times. According to defense counsel, he had considered moving to suppress the interrogation tape and had discussed that with Bowlin. Nevertheless, defense counsel testified that after preliminary hearing, he came to the conclusion that it would be more beneficial to have the tape admitted into evidence.

According to defense counsel, the tape showed how the investigators were pushing a theory for 3 plus hours during the interrogation that the State was willing to abandon after preliminary hearing. Defense counsel pointed out that the State's theory had been that Bowlin had either intentionally started the fire or recklessly done so in aiming fireworks intentionally at the house. Defense counsel testified that he thought it was very powerful to show that the State was convinced early on that the house fire had occurred a whole different way than what the prosecutor later argued in court.

Defense counsel asserted the admissions made by Bowlin in the interrogation tape were either already present in the evidence or did not contradict what Bowlin would have testified to at trial if he were willing to testify. Defense counsel testified that he thought that Bowlin's admissions showed that he was not trying to lie to the police. Defense counsel further testified that although Bowlin was not "particularly legally savvy," he insisted that Bowlin make the decision about the admission of the tape.

Based on defense counsel's testimony at the remand hearing, the State attempts to categorize defense counsel's failure to move to suppress the interrogation tape as trial strategy.

To some extent, defense counsel's decisions regarding trial strategy are protected from scrutiny by this court. "Strategic choices

made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. [Citation omitted.]" *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004).

Nevertheless, defense counsel's assertion that it was "trial strategy" to not move for suppression of Bowlin's interrogation statements would be a better argument if the case had been tried to a jury. Defense counsel could have made a more effective argument to a jury that the investigators' confusion as to what caused the fire created a reasonable doubt as to the causation element of the charged crime. The record indicates, however, that *weeks before the scheduled trial date*, defense counsel began to consider the option of waiving jury trial and later discussed it with Bowlin. Defense counsel should not have stipulated to the admission of Bowlin's interrogation statements if he was going to advise Bowlin to waive jury trial.

Moreover, contrary to defense counsel's testimony, the most damaging of Bowlin's statements occurred after Bowlin had repeatedly invoked his Fifth Amendment right to counsel. In addition, after Bowlin invoked his right to counsel during the interrogation, an officer introduced alleged statements from Jeffrey, who was Bowlin's girlfriend's family member, that he had seen Bowlin throw a rocket in the direction of the DeMotte house and that Bowlin knew that his rocket had caused the fire. Such alleged statements were damaging to Bowlin's defense as they implicated Bowlin as the perpetrator of the crime and were not subject to cross-examination. In addition, as discussed previously, the appellate record indicates that Bowlin's statements were also involuntary because they were obtained by overreaching police conduct. As a result, defense counsel should have moved to suppress the entire interrogation tape and not just those statements made after Bowlin's requests for an attorney.

Further, the record demonstrates that defense counsel was able to show, through other evidence, that the fire investigators and the detectives were uncertain about what actually started the fire and

had originally been set on their theory that an M-80 had been thrown towards the DeMotte house and had caused the house fire. Specifically, fire investigator Jones testified that their theory early on in the case was that an M-80 had been thrown by Bowlin towards the house. According to Jones, it was not until after preliminary hearing that the focus shifted from an M-80 to a rocket as being the cause of the house fire. In addition, fire investigator Long testified that during Bowlin's 3-hour interview, Bowlin had been questioned about throwing M-80's at the house. According to Long, although Bowlin had indicated during the interview that it was a bottle rocket going over the fence, "at that time, it was an M-80 we were talking about." Instead of stipulating to the admission of Bowlin's interrogation tape, defense counsel could have questioned the investigators further about their pursuit of the theory that an M-80 had caused the fire throughout Bowlin's interrogation.

At the remand hearing, defense counsel maintained that Bowlin's interrogation statements were not very helpful to the State because the State already had evidence that Bowlin had fired a rocket that went directly into the basement of the DeMotte house and started the fire. Nevertheless, what defense counsel failed to point out was the State had major credibility obstacles to overcome with its evidence.

Specifically, although Garrison testified at trial that he saw Bowlin throwing rockets at the house on the evening of July 2, 2006, his sworn testimony at preliminary hearing was that *he had not seen Bowlin throwing any fireworks towards the house directly*. Importantly, the trial court did not even reference Garrison's testimony in finding Bowlin guilty of involuntary manslaughter.

Although the trial court did reference Nino Morse's testimony and statements to others to support Bowlin's conviction, Morse admitted that he could not be very sure about exactly what happened during the incident in question because he was "pretty high and pretty drunk." Moreover, Morse's testimony indicated that he had not seen Bowlin's firework go inside the DeMotte house but had seen it fly towards the left side of the DeMotte house. In addition, the evidence showed that Morse had a warrant out for

his arrest when the incident in question occurred and that Morse had implicated Bowlin as causing the house fire only after another person pointed to Morse as causing the fire.

Because Garrison's and Morse's statements, standing alone, were not enough to create a solid case by the State, Bowlin's interrogation confession was of vital importance to the State. When faced with serious credibility flaws in the State's evidence, defense counsel should have moved to suppress the interrogation tape and should not have stipulated to its admission into evidence at trial. As recognized in 1 Goldstein, Trial Techniques, The Criminal Case § 4:30 (3d ed. 2009), "[t]he introduction of a confession . . . will often be one of the hardest burdens for defense counsel to contend with. Therefore, a careful study to determine its admissibility is always important." Here, based on the rest of the evidence presented by the State, the suppression of Bowlin's interrogation statements would have dealt a serious, if not fatal, blow to the State's case against Bowlin.

The importance of Bowlin's interrogation tape to the State's case is evident when looking at the trial judge's statements in finding Bowlin guilty of involuntary manslaughter. After discussing Nino's statements shortly after the fire and his testimony in court, the trial court focused extensively on Bowlin's interrogation statements:

"Next we turn to the defendant's taped statements. Though lengthy, several things remain constant. During this knowing and voluntary confession, the defendant repeatedly takes responsibility for unintentionally causing the fire. His fireworks and his actions caused the fire.

"As the questioning turned, his focus became narrower and more to the point. He was quoted as saying, I shot a rocket, a big rocket with a bigger stick. It was that big around, indicating a gesture. I threw a rocket. It hit the house and came down. It might have went right up on in there. One of my fireworks started the fire. I was holding it waiting for the wick to go down. It was a big thick rocket.

"He also stated during this time, in his visual proximity, there was no one else in the immediate area shooting fireworks. He didn't see anybody run from the back of the house. He didn't see any children run or in the backyard. He believed that the rocket did it and maintained that *throughout his confession*." (Emphasis added.)

Under the circumstances present in this case, we cannot dismiss as trial strategy defense counsel's decision to not even attempt to

suppress the only statements from Bowlin himself admitting that he thought his rocket caused the house fire. Upon considering the trial court's heavy reliance on Bowlin's interrogation confession, we conclude that there is a reasonable probability that, but for defense counsel's deficient conduct, the result of the proceeding would have been different.

Because we have determined that defense counsel's decision to not move for suppression of the interrogation tape constituted reversible error, we need not address Bowlin's remaining claims of ineffective assistance of counsel.

*Sufficiency of the Evidence*

Next, Bowlin contends that there was insufficient evidence from which a jury could conclude that he was guilty beyond a reasonable doubt of involuntary manslaughter. Although we are reversing and remanding for a new trial, we must also address Bowlin's sufficiency of the evidence argument to determine whether retrial is permissible under the Double Jeopardy Clause. See *State v. Elnicki*, 279 Kan. 47, 68, 105 P.3d 1222 (2005).

When a defendant challenges the sufficiency of the evidence in a criminal case, the standard of review is whether after reviewing all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 (2009).

In order for Bowlin to be convicted of involuntary manslaughter, the State needed to prove that Bowlin unintentionally killed Jewell Morse; that it was done recklessly; and that this act occurred on or about July 2, 2006, in Wyandotte County. See K.S.A. 21-3404(a); PIK Crim. 3d 56.06.

Bowlin focuses on the causation element of involuntary manslaughter and contends that the State failed to prove that his actions caused Jewell's death.

Although the fire investigators in this case were not able to conclusively determine the exact cause of the fire, they were able to eliminate several causes of the fire and their opinion was that a rocket could have caused the house fire. The State presented evi-

dence from witnesses who saw Bowlin throw a large rocket-type firework that went towards the DeMotte house.

In considering the evidence in this case, we bear in mind that a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Scaife*, 286 Kan. 614, 618-19, 186 P.3d 755 (2008). After reviewing all of the evidence in this case in the light most favorable to the State, we are convinced that—even without Bowlin's confession—a rational factfinder could have found Bowlin guilty beyond a reasonable doubt.

Reversed and remanded for a new trial.

\*\*\*

LEBEN, J., concurring: I join fully in Judge Green's opinion for the court except for one small point. Bowlin's defense attorney claimed that his decision not to challenge the admissibility of Bowlin's confession was a matter of trial strategy. The majority concluded that such a claim might at least be "a better argument" had the case been tried to a jury. In my analysis, it does not matter whether the case would be tried to a judge or to a jury. Regardless of the fact-finder, the defense counsel must attempt to suppress the defendant's confession on the factual record presented here.