# IN THE COURT OF APPEALS OF IOWA

No. 19-1938
Filed July 21, 2021

**TAJH MALIK ROSS,**
　　　Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
　　　Respondent-Appellee.

_____

Appeal from the Iowa District Court for Linn County, Sean McPartland, Judge.

Tajh Ross appeals the district court's denial of his application for postconviction relief. **AFFIRMED.**

Fred Stiefel, Victor, for appellant.

Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant Attorney General, for appellee State.

Considered by Bower, C.J., Ahlers, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**MAHAN, Senior Judge.**

Tajh Ross appeals the district court's denial of his application for postconviction relief following his 2014 convictions for murder in the first degree, intimidation with a dangerous weapon, and going armed with intent. Upon our review, we affirm the court's order denying Ross's application for postconviction relief.

## I. Background Facts and Proceedings

In its opinion affirming Ross's convictions on direct appeal, this court set forth the following facts:

> At approximately 9:30 p.m. on September 22, 2012, Haley McConnell, Neil Clark, and Latasha Roundtree were going to a party in Cedar Rapids. McConnell was driving, Roundtree was sitting in the passenger's seat, and Clark was sitting in the back. The address of the house was 649 16th Avenue SW. The streets were not well lit, and being unable to locate the residence, they drove around the neighborhood slowly at approximately five to ten miles per hour.
>
> After driving past the house at 649 16th Avenue SW, the passenger window shattered, and Roundtree fell over, having suffered a gunshot wound to the head. After Roundtree was shot, McConnell sped away and heard gunshots as she drove further down the street. Clark urged McConnell to drive to a local hospital, and following emergency treatment there, Roundtree was transported to University Hospitals in Iowa City but died shortly thereafter.
>
> The house located at 649 16th Avenue has two rental units, one upstairs and one downstairs. Amber Houston and her cousins, Jeremiah Ellis and Frederick Hanson, lived in the downstairs unit. Earlier in the day on September 22, Ellis's girlfriend, Alleigha Church-Greene, informed Ellis she had heard of plans that Davonte Safforld intended to "shoot up" Ellis's residence. The district court noted, "There was bad blood between Ellis and Safforld for reasons unexplored in the testimony." It was agreed the threat was not serious, and the party was not cancelled.
>
> Those invited to the party were Liban Muhidin (Liban), Yasin Muhidin (Yasin), Adrian Kenney, Alexus Omar, Church-Greene, and Ross. All had arrived at the residence by approximately 9:00 p.m. Shortly thereafter, Ellis and Hanson began discussing the threat

posed by Safforld, and everyone at the house became aware of it. Yasin and Kenney then left so Yasin could change clothes. The others were gathered outside the residence.

A green car passed by the house, which the parties believed could contain Safforld because Safforld's girlfriend drove a green vehicle. Ellis went to the corner and watched it drive away. Meanwhile, Liban called Yasin and told him to retrieve Liban's guns from his residence. Yasin returned with an AK–47 and a .40 caliber handgun in the trunk of Liban's car. Liban placed the AK–47 in an empty trashcan across the street, while Yasin and Ross argued over who should hold the handgun. Ross took the handgun, telling Yasin he was too little to operate it. Ellis was also armed with his own .22 caliber handgun.

After the guns were distributed and most of the group had crossed the street to an abandoned house, the parties observed McConnell's car (a white vehicle) drive slowly past. Ellis raised his handgun but was prevented by Yasin from firing. The second time the car approached the house, Liban ran across the street to the 649 residence so the vehicle would decrease its speed. After Liban reached the property, Ross cycled the gun, told Liban to "look out," and fired the gun in the direction of the vehicle. Ellis ran into the street and fired five shots at the vehicle, and Ross ran down the alley, firing six more times at the car. The bullet that killed Roundtree was later matched to the .40 caliber handgun Ross had used.

*State v. Ross*, No. 14-1717, 2016 WL 1677181, at *1–2 (Iowa Ct. App. Apr. 27, 2016) (footnote omitted).

The State charged Ross with various offenses, and following a bench trial, the district court found him guilty of all counts except for the charge of conspiracy to commit a forcible felony. This court affirmed Ross's convictions on direct appeal, rejecting his challenges to the sufficiency of the evidence and the district court's denial of his counsel's motions to withdraw and failure to allow Ross to proceed pro se. *Id.* at *3–7.

Ross filed an application for postconviction relief (PCR). Following trial, the court entered an order denying Ross's application. Ross appealed. Facts specific to his claims on appeal will be set forth below.

## II.     Standard of Review

"Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law." *Nguyen v. State*, 878 N.W.2d 744, 750 (Iowa 2016) (citation omitted).  However, "ineffective-assistance-of-counsel claims are reviewed de novo." *Id.*

## III.     Ineffective Assistance of Counsel

Ross contends his trial counsel was ineffective in (A) failing to file "a motion to suppress evidence of Ross's police interview" "after he said he was done answering questions," and (B) failing to call "a firearm expert witness at trial on the issue of the gun accidentally firing as Ross explained to the police."  To prevail on his claims, Ross must show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  An ineffective-assistance-of-counsel claim fails if either element is lacking.  *See State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012).

### A.     Failure to File Motion to Suppress

Ross claims his counsel breached an essential duty by failing to seek suppression of his statements after he invoked his right to remain silent, which included his "statement that he shot the gun," and that he was prejudiced by this omission because had his statements been suppressed, he "would not have had to testify at the criminal trial" and "[t]he only evidence that [he] fired a gun would have been the conflicting statements of the other people present at the party."

Police are required to inform a suspect of the right to remain silent and the right to counsel during a custodial interrogation. *See* U.S. Const. amends. V, VI, XIV (ensuring a criminal defendant, among other things, the right to remain silent during custodial interrogation); Iowa Const. art. 1, § 9 (affording similar protections under Iowa Constitution); *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Absent *Miranda* warnings and a valid waiver of those rights, statements made during a custodial interrogation are inadmissible. 384 U.S. at 479; *State v. Harris*, 741 N.W.2d 1, 5 (Iowa 2007). "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *State v. Palmer*, 791 N.W.2d 840, 846 (Iowa 2010) (quoting *Miranda*, 384 U.S. at 473–74); *State v. Prentiss*, No. 02-0043, 2003 WL 21360908, at *5 (Iowa Ct. App. June 13, 2003) ("This right to cut off questioning must be scrupulously honored.").

A suspect, having expressed a desire to remain silent, "is not subject to further interrogation . . . , *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Harris*, 741 N.W.2d at 6 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). "A valid waiver under these circumstances requires the individual to 'evince[ ] a willingness and a desire for a generalized discussion about the investigation.'" *Id.* (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983)).

In this case, Ross was subjected to two separate sessions of custodial interrogation, the first of which took place approximately one week after the incident, during which Ross denied any involvement in the shooting and denied

having a gun. The second interview took place several months later, and Ross again denied having a gun or any involvement in the shooting. Ross then stated, "I want to go back home," to which the police responded, "You can't go anywhere today, so you're going to stay with us." Ross stated, "I want to call my mom" and that he did not understand why he had to stay there "all day" but no one else involved in the incident had. The police then left the room. They returned, and Ross stated, "I'm not talking." An officer then said, "You're going over to jail today." Ross continued to deny involvement in the shooting and asked what the charges against him were. The police then left the room again; when they returned, they began reading Ross the charges against him. When Ross heard the murder charge, he became very upset and said, "[Is it] because I'm not telling you all exactly what happened? So if I tell you all exactly what happened, from my story, would you all know the difference—" An officer responded, "If you told us exactly what happened, we'd know the truth." Ross then said, "Alright, I'll tell you all the truth right now, come on, everybody sit down, close the door."

Ross's statement that he did not want to talk was sufficient to invoke his right to remain silent. But Ross arguably reinitiated communication with the officers when he asked if he was being charged with murder because he was "not telling . . . exactly what happened," and he told the officers to "sit down" and "close the door" so he could tell them "the truth." We could find Ross's statements demonstrated "a willingness and a desire for a generalized discussion about the investigation," *see Bradshaw*, 462 U.S. at 1045–46; *accord State v. Johnson*, No. 08-0320, 2009 WL 4842480, at *4–5 (Iowa Ct. App. Dec. 17, 2009), and

therefore the officers' "decision to proceed with the interrogation was not improper," *Johnson*, 2009 WL 4842480, at *5. The interview continued, and Ross subsequently admitted he fired the gun in the direction of McConnell's car, but that he shot "in the air" and hit Roundtree accidentally.

In any event, we concur with the PCR court's finding that trial counsel did not fail to perform an essential duty given the circumstances in this case.[1] As the court noted:

> [I]n evaluating the objective reasonableness of trial counsel's conduct in failing to file a motion to suppress, the Court examines all of the circumstances to consider whether acts or omissions were outside the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690. The circumstances here include the testimony of [defense counsel,] Mr. Weimer, which the Court found to be credible and which was unchallenged by Mr. Ross, that Mr. Ross was not always forthcoming in cooperation with his counsel. Mr. Weimer testified that Mr. Ross was not always helpful in assisting with his defense and at times was working at odds with his counsel to present a defense. Mr. Weimer's testimony is also supported by other information in the record, including Mr. Ross's earlier unsuccessful attempts at self-representation, including his failure "to respond to the majority of the court's questions," his continual refusal "to give meaningful answers," his "disjointed and rambling statements" and other pretrial actions of Mr. Ross reflecting conflicts with his counsel, detailed in the decision of the Court of Appeals. *Ross*, No. 14-1717, 2016 WL 1677181, at *3, *4, *5. The conduct and "strategy" of Mr. Ross in preparation for and presentation of evidence at trial clearly complicated the ability of counsel to formulate

---

[1] In light of this conclusion, there is no need to address the State's assertion the failure to file a motion to suppress was due to trial strategy of defense counsel. But we observe that defense counsel testified he did not believe a motion to suppress would have been meritorious because Ross initiated further communication. Specifically, defense counsel stated they "considered" filing a motion to suppress Ross's statements but "because of the reengagement that he was involved in, we did not file that." Defense counsel further explained, "After he was read the complaints, he asked if it was because he wasn't telling them what had happened, and he asked them to sit down and said that he was telling them the truth. He reengaged them. . . . He reengaged them before they reengaged him."

strategies and decisions related to defenses, including whether or not to present evidence that Mr. Ross fired the gun accidentally or without intent to shoot at the passing car. In the end, Mr. Ross chose to testify at trial and offered testimony that he intended to fire the gun above the car as a warning, but the gun accidentally discharged prematurely. Such testimony of Mr. Ross was generally consistent with statements to the police by Mr. Ross. The Court finds and concludes counsel properly made "[s]trategic choices . . . after a thorough investigation of law and facts relevant to plausible options," and that counsel was not ineffective in not seeking to suppress such evidence and in presenting such evidence at trial. *Strickland*, 466 U.S. at 690–91.

In summary, in evaluating the objective reasonableness of trial counsel's conduct, it appears Mr. Ross's actions and communications with his counsel may have, intentionally or not, sabotaged his own defense. The Court finds and concludes that the conduct of Mr. Ross in failing to cooperate with his counsel in preparing for and presenting a defense at trial, which he now urges should have been presented, should not form the basis for a claim that counsel was ineffective, entitling Mr. Ross to a new trial. Otherwise, any defendant could sabotage its defense at a first trial, thereby getting a preview or rehearsal of the trial, and later obtain a second trial based on allegations of ineffective assistance of counsel. Mr. Ross now apparently contends that ineffective assistance of his trial counsel resulted in his being required to testify at trial and resulted in his failure to present credible testimony. Under the circumstances here, it is not surprising that Mr. Ross's testimony at trial did not go well or that the fact finder found his testimony not to be credible. The failure to seek exclusion of his prior statements to police, however, did not require Mr. Ross either to testify or to present at trial testimony which was not credible and which was at odds with the other evidence in the case. Moreover, as noted below, the lengthy and detailed findings and conclusions of the court in reaching verdicts against Mr. Ross did not rely heavily, if at all, on the statements made by Mr. Ross to the police.

Moreover, to meet the prejudice prong of his ineffective-assistance claim, Ross must prove a reasonable probability that, but for his counsel's failure, the result of the proceeding would have been different. *Maxwell*, 743 N.W.2d at 196; *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome." (quoting

*Strickland*, 466 U.S. at 694)). Here, there was substantial evidence of Ross's guilt without regard to his own statements during the interview. As this court previously found:

> Ross and the others were aware of a potential threat, and when they saw the first car—a green vehicle—drive past, they armed themselves in response. Ross retained control over the .40 caliber handgun, following an argument between him and Yasin over who was going to use it. Then, when McConnell's white car drove past the house, Ross proceeded to cycle his gun and fire at the car a number of times. Viewing the evidence in the light most favorable to the State, and making all legitimate inferences in favor thereof, this did not amount to an accidental shooting.

*Ross*, 2016 WL 1677181, at *5. And as the PCR court further noted:

> The Court finds and concludes here that Mr. Ross has not met his burden of establishing prejudice by the actions of his counsel as required in the case law. Had Mr. Ross successfully urged a motion to suppress and declined to testify, the evidence offered by the State, including testimony by witnesses as to actions and statements by Mr. Ross surrounding the crime, would have gone largely unchallenged. Moreover, the lengthy and detailed findings and conclusions of the court placed little or no significance on the statements made by Mr. Ross to the police. Rather, the court relied upon the eyewitness accounts of actions and statements by Mr. Ross, notwithstanding that the witnesses to such conduct themselves had credibility issues. Such testimony included witnesses who saw Mr. Ross specifically pointing the gun toward the car and who heard Mr. Ross telling one of the witnesses to "look out" just before a shot is heard. . . .
> In summary, despite any errors of counsel alleged by Mr. Ross, the Court finds and concludes that Mr. Ross has failed to establish sufficient evidence to establish that, but for counsel's errors, the result of the proceeding would have been different.

Upon our review of the facts of this case, we conclude defense counsel did not breach an essential duty in failing to file a motion to suppress.[2] And even if we

---

[2] Ross also contends the PCR court erred "in not considering the audio and visual recording of Ross' police interview in making its ruling on whether a Motion to Suppress should have been filed." We observe the court's statement that "[n]either an audio recording nor transcript of the interrogation was offered at the time of trial

assume there is merit to his claim, Ross has failed to show resulting prejudice. *See Ledezma*, 626 N.W.2d at 142 ("If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently."). Ross's ineffective-assistance-of-counsel claim on this basis is unpersuasive.

B. *Failure to Call Firearms Expert*

Ross next contends his trial counsel was ineffective "in not using an expert in firearms witness at the trial." Ross acknowledges "the State's firearms expert testified that the bullet that caused the death came from the gun that Ross fired," but he alleges the State's expert "did not testify about crime scene reconstruction or the human aspects of the use of a firearm." According to Ross, because his defense "was that the gun accidentally fired, it was essential to that defense to have a witness explain how the gun potentially could have accidentally fired too soon (before Ross aimed over the car)."

---

of this matter" indicates Ross failed to seek review of this specific piece of evidence, despite the fact it was included in the record. *Cf.* Iowa Code § 822.6A ("The underlying trial court record containing the conviction for which an applicant seeks postconviction relief . . . shall automatically become part of the record in a claim for postconviction relief under this chapter."). Accordingly, there is nothing for us to review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002); *see also Stammeyer v. Div. of Narcotics Enforcement*, 721 N.W.2d 541, 548 (Iowa 2006) (finding an argument not preserved for appeal when there was "nothing indicating the court ruled upon or even considered [it]"). The proper procedure to preserve error was to file a motion raising the court's failure to consider the evidence prior to appealing. *See Lamasters v. State*, 821 N.W.2d 856, 863 (Iowa 2012).

In any event, the PCR court quoted from Ross's own recitation of the interview and the police report in addressing and rejecting his claim. And, under our de novo review, we have reviewed the evidence upon which Ross bases this challenge, and we reject this claim.

Ross presented testimony from Wayne Hill, a firearms expert, at the PCR trial. Hill stated a shooter could fire a gun prematurely if "[h]e's not paying attention to what he's doing" or "to the pressure he's putting on the trigger." Hill further stated that "6 pounds is not that heavy," meaning it does not take much pressure to pull the trigger to fire the gun. Hill opined that "an untrained person with a firearm can definitely have an unintentional discharge," but "there's no physical evidence for me to hang my hat on" to determine whether it was an accidental discharge in Ross's case. Hill did not testify at Ross's criminal trial, which according to Ross, prevented the court from learning "that only 6.25 pounds of pressure are required to fire the gun" and "that under stress and excitement an inexperienced person in the use of firearms is more likely to accidentally fire a gun."

With regard to the decision not to call a firearms expert, trial counsel testified:

> In this case we didn't feel an expert on those—those issues was necessary because we had the information, at least, that the State's own witness would have conceded that an accidental discharge was a possibility. Wouldn't necessarily agree that's what happened in this case, but that they had conceded at some point that there was the possibility of an accidental discharge.

Trial counsel testified the defense strategy was to argue that Ross brought the gun up and it fired accidentally; i.e., "that he fired over the top of the vehicle." Trial counsel furthered this strategy at Ross's criminal trial in his questioning of Iowa Department of Criminal Investigations firearms expert, Victor Murillo. Trial counsel asked Murillo about whether the gun had "an external safety," whether "a person of normal health or normal condition" would be able to fire the gun, and whether the "rate of the fall of the projectile" would vary if the gun was fired from

certain distances away. Trial counsel also elicited testimony from Murillo that "[i]t takes six and a quarter pounds of pressure rearward on that trigger to cock and release the striker." We do not find trial counsel breached a duty in failing to call a witness to testify to the same evidence already presented to the court.

We conclude counsel's trial strategy, tactical decisions, and accompanying investigation were reasonable under these circumstances. *See Ledezma*, 626 N.W.2d at 143. We further note trial counsel's testimony that various witnesses had different perspectives on what happened, and Ross was "not particularly forthcoming with a lot of information." It appears trial counsel's strategy was effective, as the district court noted it is "possible" that Ross's alleged accidental discharge of the gun led to Roundtree's death, but ultimately the court concluded, "Considering all of the evidence in this case, I do not find this explanation to be believable"; "the likelihood is so remote as to make the explanation unreasonable." Ross's ineffective-assistance-of-counsel claim on this basis fails.

## IV.    *Consideration of Pro Se Filing*

Ross argues this court "should consider the matters discussed in [his] pro se brief," despite Iowa Code section 822.3A(1) (Supp. 2019), which provides: "An applicant seeking relief under section 822.2 who is currently represented by counsel shall not file any pro se document, including an application, brief, reply brief, or motion, in any Iowa court. *The court shall not consider, and opposing counsel shall not respond to, such pro se filings*." (Emphasis added.) Section 822.3A became effective on July 1, 2019, prior to the PCR court's October 2019 order denying Ross's PCR application, and therefore precludes this court from

considering Ross's pro se supplemental brief. *See Hrbek v. State*, 958 N.W.2d 779, 782–89 (Iowa 2021) (rejecting various challenges to section 822.3A and directing the clerk of the supreme court "to strike [the applicant]'s pro se supplemental briefs"); *Haywood v. State*, No. 18-1476, 2020 WL 1551137, at *1 n.1 (Iowa Ct. App. Apr. 1, 2020) (acknowledging that Iowa Code section 822.3A(1) precludes appellate court consideration of pro se materials filed after July 1, 2019).

We affirm the denial of Ross's application for postconviction relief.

**AFFIRMED.**