# IN THE SUPREME COURT OF IOWA

No. 82 / 05-1521

Filed August 24, 2007

**STATE OF IOWA**,

Appellee,

vs.

**KEVIN KAWANZEL HARRIS**,

Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Marsha M. Beckelman, Judge (motion to suppress) and Douglas S. Russell, Judge (trial).

Criminal defendant appeals denial of his motion to suppress evidence. **DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Dennis D. Hendrickson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, Harold Denton, County Attorney, and Susan Nehring, Assistant County Attorney, for appellee.

**STREIT, Justice.**

What does a suspect in custody need to do to invoke his right to an attorney?  He just needs to ask for one.  In the present case, the suspect repeatedly requested to speak with an attorney.  Instead of ending the interrogation, the detective responded "You don't trust us enough to do it without a lawyer?"  We find Kevin Harris's Fifth Amendment right to the presence of an attorney was violated when the detective continued to interrogate him after he invoked this right.  Moreover, the detective violated Harris's statutory right to contact a family member by refusing to allow Harris to call his brother.  Both violations require suppression of Harris's subsequent statements.  It was error to deny Harris's motion to suppress.  This error was not harmless.  We remand for a new trial.

### I.    Facts and Prior Proceedings.

On January 6, 2003, at approximately 1:00 a.m., a 1995 Lincoln Continental automobile parked on the side of a road in Cedar Rapids was set on fire.  The Cedar Rapids Fire Department and Police Department responded.  When the fire was extinguished, police and firefighters discovered Joseph Harris's burned body inside the vehicle.  He had three bullet wounds to the head.  The authorities eventually assembled a case against Miguel Jones and Kevin Harris.

Jones was arrested for arson.  Harris eluded police until August 23, 2004 when he was taken into custody after being arrested for failure to appear.  He was also held on a material witness warrant in regard to the aforementioned homicide investigation.  That morning, Cedar Rapids Police Detective Doug Larison questioned Harris about his role in Joseph's death.  Harris eventually admitted to witnessing Joseph's murder.  According to Harris, Jones pulled out a gun and killed

Joseph while the three of them were in the Lincoln. Harris admitted pouring gasoline over the interior of the vehicle and Joseph's body and lighting the gasoline with a cigarette lighter. He claimed he did so only because he feared Jones would kill him too.

After Harris's confession, he was charged with arson in the second degree, a class C felony, in violation of Iowa Code sections 712.1 and 712.3 (2003) and obstruction of justice, an aggravated misdemeanor, in violation of Iowa Code section 719.3. Harris filed a motion to suppress his confession,[1] arguing the detective violated his *Miranda* rights and his statutory right to speak with a family member. *See* Iowa Code § 804.20. The district court denied the motion. Harris waived his right to a jury and stipulated to a bench trial on the minutes of testimony. He was found guilty of both counts.

Harris appealed, arguing the district court erred by denying his motion to suppress. He claimed the detective violated his *Miranda* rights by continuing the interrogation after he requested an attorney. Moreover, Harris alleged the detective violated Iowa Code section 804.20 when he denied Harris's requests to call his brother. According to Harris, both violations required his confession to be suppressed. The State argued the detective did not violate *Miranda* because Harris's requests for an attorney were either (1) ambiguous, or (2) if unambiguous, Harris subsequently waived his right to have an attorney present by initiating further communication with the detective. The State conceded the detective violated Iowa Code section 804.20. However, it argued

---

[1]Harris's motion to suppress was filed more than forty days after his arraignment. We agree with the district court there was good cause to accept the late filing of the motion because newly appointed counsel needed time to receive and review the nearly four hours of videotape. *See* Iowa R. Crim. P. 2.11(3), (4). Thus, error was preserved and we do not reach the issue of ineffective assistance of counsel.

suppression of Harris's statements was not the appropriate remedy. Alternatively, the State argued it was harmless error for the district court to admit Harris's confession.

Harris's appeal was transferred to the court of appeals, which affirmed the district court's denial of his motion to suppress. On further review, we hold Harris's Fifth Amendment right to have an attorney present during interrogation and his statutory right to contact a family member were violated. Harris's motion to suppress should have been granted. We remand for a new trial.

## II. Scope of Review.

We review constitutional claims de novo. *State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001). Our review of the district court's interpretation of Iowa Code section 804.20 is for errors at law. *State v. Moorehead*, 699 N.W.2d 667, 671 (Iowa 2005).

## III. Merits.

### A. *Miranda.*

The Fifth Amendment of the United States Constitution guarantees "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." There is no similar provision in the Iowa Constitution but the Fourteenth Amendment extends the privilege against self-incrimination to state prosecutions. *See Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492–93, 12 L. Ed. 2d 653, 658 (1964).

In the landmark decision of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held "the privilege against self-incrimination is jeopardized" when an individual is subjected to custodial interrogation. *Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726. "[T]he term 'interrogation' under *Miranda*

refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90, 64 L. Ed. 2d 297, 308 (1980). The Court in *Miranda* determined an individual in custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726; *see also Dickerson v. United States*, 530 U.S. 428, 444, 120 S. Ct. 2326, 2336, 147 L. Ed. 2d 405, 420 (2000) (holding that because *Miranda* was a constitutional decision, it cannot be overruled by an act of Congress).

The Court in *Miranda* dictated the subsequent procedure police must follow if an individual invokes his Fifth Amendment privilege:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Miranda*, 384 U.S. at 473–74, 86 S. Ct. at 1627–28, 16 L. Ed. 2d at 723.

Absent a recitation of the *Miranda* warnings and a valid waiver of the right to remain silent and the right to the presence of an attorney, any statement made by an individual in response to custodial

interrogation is inadmissible. *Id.* at 476, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725; *see Innis*, 446 U.S. at 299–300, 100 S. Ct. at 1689, 64 L. Ed. 2d at 307 (holding *voluntary* declarations made while in custody, whether or not the *Miranda* warnings have been given, are admissible if they are not made in response to police questioning). The State has the burden to prove the individual "knowingly and intelligently waived" these privileges. *Miranda*, 384 U.S. at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724; *see Davis v. United States*, 512 U.S. 452, 461, 114 S. Ct. 2350, 2356, 129 L. Ed. 2d 362, 373 (1994) (referring to a "knowing and voluntary waiver of the *Miranda* rights"); *State v. Lamp*, 322 N.W.2d 48, 54 (Iowa 1982) (stating a waiver "must consist of some affirmative conduct indicative of voluntary, intentional, and knowing relinquishment of the right to counsel; waiver cannot be presumed from inaction or mere silence"), *overruled on other grounds by State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000).

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 1884–85, 68 L. Ed. 2d 378, 386 (1981). In other words, "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* at 484–85, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386 (emphasis added). "But even if a conversation . . . is initiated by the accused, where reinterrogation

follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 2834, 77 L. Ed. 2d 405, 412 (1983). A valid waiver under these circumstances requires the individual to "evince[] a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045–46, 103 S. Ct. at 2835, 77 L. Ed. 2d at 412.

With these principles in mind, we turn to the facts of this case. It is undisputed Harris was subjected to custodial interrogation on August 23, 2004. At approximately 8:49 that morning, the detective began questioning Harris about the arson and homicide. The interrogation was videotaped. Prior to any questioning, Detective Larison read Harris the *Miranda* warning. Harris verbally agreed to answer questions without counsel present, but he declined to provide a written waiver of his *Miranda* rights.

At 9:50 a.m., after being questioned for approximately one hour about the night of the murder, Harris said, "If I need a lawyer, tell me now." The detective responded, "That's completely up to you" and continued the interrogation. Harris's statement was not sufficient to invoke his right to the presence of an attorney. *See State v. Washburne*, 574 N.W.2d 261, 267 (Iowa 1997) (asking whether counsel is needed is not sufficient to invoke right to counsel). Officers have no obligation to stop questioning an individual who makes an ambiguous or equivocal request for an attorney. *Davis*, 512 U.S. at 461–62, 114 S. Ct. at 2356, 129 L. Ed. 2d at 373. Thus, the detective was permitted to continue questioning Harris after this exchange.

The detective told Harris his investigation had already revealed Harris was involved and encouraged Harris to tell his "side of the story." Harris said he did not have a side of the story; he claimed to not know what the detective was talking about and said he did not like the detective's "trick questions." At 10 a.m., the detective asked again for Harris's "side of the story." Harris replied, "I don't want to talk about it. We're going to do it with a lawyer. That's the way I got to go." The detective said, "What do you mean?" Harris responded, "You got all these trick questions. I don't understand." The detective said, "You want to do it with a lawyer, is that what you're saying?" Harris replied, "Yeah, because I don't understand all these questions."

Harris clearly and unequivocally requested an attorney at this point in the interrogation. The Supreme Court has said "a suspect need not 'speak with the discrimination of an Oxford don.' " *Id.* at 459, 114 S. Ct. at 2355, 129 L. Ed. 2d at 371 (quoting Justice Souter's concurrence). Instead, he must make "his desire to have counsel present sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459, 114 S. Ct. at 2355, 129 L. Ed. 2d at 371.

At this juncture, Detective Larison properly stopped interrogating Harris. He asked Harris if he had a lawyer. Harris said, "No, but I can get one though." The detective asked Harris if there was anyone in particular he wanted to represent him. Harris replied, "Uh, I don't know. I got to find one. Get my people to find me one. And then we can get a lawyer and then you can get my story." Harris told the detective "Dave Grinde" had previously represented him. The detective asked whether Harris wanted him to call Mr. Grinde. Harris replied, "Yeah, because

these are trick questions. If you get my story out of me, I want my lawyer to be there."

Harris could not have been more clear—he wanted an attorney present during police questioning. The detective was obligated to stop questioning Harris regarding the arson and homicide. *Miranda*, 384 U.S. at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d at 723. Instead, the detective continued the conversation by asking "You don't trust us enough to do it without a lawyer?" The State claims this question was a "rhetorical question" or "a mere observation." We do not find this question so innocent. A police officer may not "cajole[]" a defendant into waiving his Fifth Amendment rights. *Miranda*, 384 U.S. at 476, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725. While it is good police practice to clarify an ambiguous request, it is not appropriate to ask a suspect to justify his unequivocal decision to have an attorney present.

By asking "You don't trust us enough to do it without a lawyer?" the detective deftly and subtly kept Harris talking. Shortly thereafter, the detective resumed his interrogation. He said, "And you want to get this behind you." Harris replied, "Hell yeah." The detective said, "And get it out on the table. Tell us what really happened." Harris responded, "Yup, because I ain't got time for this, man." The detective then asked, "Because you're thinking what we're hearing isn't the accurate truth?" This dialogue, initiated by the detective was impermissible because it was "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301, 100 S. Ct. at 1689–90, 64 L. Ed. 2d at 308. In *Edwards*, the Supreme Court held once a suspect has invoked his Fifth Amendment right to an attorney, he shall not be subject to further interrogation unless *he* initiates further communication. *Edwards*, 451 U.S. at 484–

85, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386; *see Miranda*, 384 U.S. at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d at 723 ("Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."). Thus, Harris did not waive his previously invoked right to have an attorney present when he responded to the detective's questions. *See Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884–85, 68 L. Ed. 2d at 386.

It was also improper for the detective to delay calling the attorney Harris requested by name as part of a strategy for interrogation. Detective Larison told Harris, "We also need to go through the county attorney because they're the ones that make the final decision on who gets charged, who doesn't get charged, who gets charged with what. They make the final decision on that, okay?" Harris replied, "Cool." The detective asked, "And so would you like me to call them too and let them know you want to tell us exactly what happened with an attorney so that we can make some kind of arrangement? Because you said you don't want to go to jail for this." Harris responded, "No, not for nothing I didn't do, man." The detective said, "If I were to tell you we were only interested in the person who pulled the trigger." Harris said, "Then I got you. I promise you that."

At approximately 10:18 a.m., after a bathroom break, the detective said, "Let me call the county attorney and then we're going to call your attorney, just like you wanted." The detective left Harris in the interrogation room until approximately 11:37 a.m. when he returned with the county attorney's offer of testimonial immunity. After hearing the offer, Harris said, "That's bullshit, man. I need an attorney then.

That's bullshit." Harris explained his involvement was forced because he was afraid of getting killed too. The detective explained the offer of testimonial immunity again. The detective said, "Understand, you don't have to pull the trigger to be guilty of conspiracy to commit murder." He continued, "You have asked for an attorney already so if you want to tell me what happened I have to make sure that you've changed your mind and you don't need an attorney here." Harris replied, "Man, fuck the attorney. I'm in the right as far as I'm concerned. I'm in the right." The detective asked, "You're confident about that?" Harris said, "I'm confident about that." About ten minutes later, Harris acknowledged he was present when Jones shot Joseph and admitted to starting the fire.

The State argues Harris waived his right to have an attorney present with this exchange. However, it was inappropriate for the detective to continue questioning Harris and as part of that questioning to act as a conduit between the county attorney's office and Harris, once Harris requested an attorney. Any "deal" should have been negotiated by the attorney Harris requested. There was no valid reason to continue questioning Harris after his request to speak with Mr. Grinde. If Mr. Grinde was unavailable, then Harris should have been returned to his jail cell. It appears the detective was hoping Harris would keep talking once he heard what the county attorney was willing to offer. That is exactly what happened. *Miranda* and its progeny make clear an interrogation must cease once the suspect requests an attorney. Because the detective continued to interrogate Harris after he asked to speak to an attorney, there was no valid waiver. *See Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884–85, 68 L. Ed. 2d at 386. Consequently, Harris's statements made after he unambiguously asked for an attorney

should have been suppressed.  It was error to deny Harris's motion to suppress.

**B.      Statutory Right to Contact a Family Member.**

Harris also argues his statutory right to contact a family member was violated.  Iowa Code section 804.20 provides:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. . . . A violation of this section shall constitute a simple misdemeanor.

Iowa Code § 804.20.  We have previously held section 804.20 does not require a police officer to inform an individual in custody of his right to contact counsel or a family member.  *State v. Stroud*, 314 N.W.2d 437, 439 (Iowa 1982).  "An officer may not, however, tell a defendant he does not have such a right, and once the right is invoked the officer must give the defendant the opportunity to call or consult with a family member or attorney."  *Moorehead*, 699 N.W.2d at 671 (citing *State v. Vietor*, 261 N.W.2d 828, 831 (Iowa 1978)).

In the present case, Harris asked to call his brother about the same time he began asking for an attorney.  He said, "Yeah, I want to talk to a lawyer.  I want to talk to a lawyer and then I want to talk to my brother."  The detective said he first needed to call the county attorney to see if they could "make some kind of arrangement."  Harris replied, "I know you got to do that.  So, this is all I'm going to ask—to talk to the lawyer, then talk to my brother."  After the detective accompanied Harris to the bathroom, he escorted Harris back to the interrogation room where Harris was left alone for approximately an hour and twenty minutes.  At one point, the detective checked on Harris and told him he was waiting

to hear back from the county attorney. Harris asked to use the phone. The detective replied, "Not right now. The first thing I want to do is get something from the county attorney."

On appeal, the State concedes the detective violated Harris's statutory right to contact a family member. Thus, we are left to determine the appropriate remedy.

We filed our opinion in *Moorehead* approximately two months before the district court conducted a hearing on Harris's motion to suppress. In *Moorehead*, we held a statement obtained after an " 'unnecessary delay' " in allowing a defendant to contact a family member or attorney should be suppressed unless it was made spontaneously. *Moorehead*, 699 N.W.2d at 675 (quoting Iowa Code § 804.20). Prior to *Moorehead*, we had "never declared that a violation of section 804.20, which is not also a violation of *Miranda*, will in all instances require suppression of a resulting confession." *State v. Bowers*, 661 N.W.2d 536, 541 (Iowa 2003).

The district court refused to apply *Moorehead* to the present case because the opinion had "not yet been released for publication" and "was released after the interrogation . . . ." Instead, the court relied on case law, which was overruled in *Moorehead*, and ultimately concluded Harris's statements made after he was denied permission to call his brother were admissible.

It was wrong to ignore *Moorehead*. Our opinions are binding on Iowa's courts as soon as they are filed.[2] Iowa Rule of Appellate Procedure

---

[2]Procedendo had not yet issued for *Moorehead* when the district court filed its suppression ruling in this case because a petition for rehearing, which was ultimately denied, was still pending. *See* Iowa R. App. P. 6.30 ("Unless otherwise ordered by the supreme court, no procedendo shall issue for 15 days after an opinion of the supreme court is filed, nor thereafter while a petition for rehearing, filed according to these rules, is pending."). Although some courts hold opinions are not binding until procedendo

6.14(5)(*b*), which states "unpublished opinions shall not constitute controlling legal authority," is not applicable to our authored opinions because it defines "an 'unpublished' opinion [as] an opinion the text of which is not included *or designated for inclusion* in the National Reporter System." (Emphasis added.)  All of the supreme court's opinions (with the exception of per curium opinions) are published in the Northwest Reporter.  *See* Iowa R. App. P. 6.25.  Courts may not ignore our opinions pending Northwest Reporter citations.  Under *Moorehead*, Harris's statements made after he first requested permission to speak to his brother should have been suppressed because Harris was never given the opportunity to call his brother.

### C.    Harmless Error.

The district court should have granted Harris's motion to suppress.  The State argues it was harmless error to deny the motion.  Most federal constitutional errors, including the erroneous admission of evidence in violation of a defendant's Fifth Amendment rights, do not require reversal if the error is harmless.  *State v. Peterson*, 663 N.W.2d 417, 430 (Iowa 2003).  "To establish harmless error, the State must 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' "  *Id.* at 431.  As for a nonconstitutional error, reversal is "required if it appears the complaining party has suffered a

---

has issued, we think the better rule is opinions are binding the day they are filed (unless we specifically provide a different effective date) and remain so until a petition for rehearing is granted.  *See Stoke v. Converse*, 153 Iowa 274, 276, 133 N.W. 709, 710 (1911) ("the granting of a rehearing has the effect to withdraw the opinion previously filed . . . ."); *Pitkin v. Peet*, 96 Iowa 748, 751, 64 N.W. 793, 795 (1895) ("when the rehearing was ordered, that opinion was suspended . . . .").  To hold otherwise would allow meritless petitions for rehearing to delay the precedential effect of our decisions.  It would also elevate the importance of a procedendo when "[t]he entire purpose of a procedendo is to notify the lower court that the case is transferred back to that court." *In re M.T.*, 714 N.W.2d 278, 282 (Iowa 2006).

miscarriage of justice or his rights have been injuriously affected." *Moorehead*, 699 N.W.2d at 672.

While there was certainly other evidence to support the verdict,[3] the district court's findings of fact relied heavily on Harris's confession. We cannot say the confession had no affect on the verdict. Thus, a new trial is required.

### IV. Conclusion.

Harris's Fifth Amendment right to an attorney and his statutory right to contact a family member were violated. Both violations required suppression of the statements made by Harris after he requested an attorney and requested permission to call his brother. Thus, the district court erred by not granting Harris's motion to suppress. This error was not harmless. We order a new trial.

**DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

---

[3]Harris and Jones were pulled over in a Jeep for speeding minutes after the Lincoln Continental was set on fire. Harris, who was in the front passenger seat, was wearing a white t-shirt with reddish-brown discoloration on the chest area. The ends of his hair appeared to be singed. Harris was allowed to leave the scene. While the officer was preparing traffic tickets for Jones, he heard over dispatch an attempt to locate a vehicle matching the Jeep's description. As a result, the officer continued to detain Jones and the Jeep. The owner of the Jeep soon arrived at the traffic stop. He told the officers that Harris had called him and instructed him to remove a coat and some keys from the Jeep. He was not allowed to do so. An eye witness was brought to the scene and identified the Jeep as the vehicle he saw leaving the fire. Police executed a search warrant on the Jeep and found a gasoline can in the back of the Jeep. A burned nylon parka was on top of the gasoline can. Officers found a set of keys belonging to the Lincoln. Harris's fingerprint was found on the rear hatch of the Jeep near where the gasoline can was located. The owner of the Jeep later told officers he saw Jones and Harris place the gasoline can into the Jeep on the evening of January 5, 2003.