# IN THE COURT OF APPEALS OF IOWA

No. 21-1173
Filed October 19, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JUSTIN CHRISTOPHER HURDEL,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Webster County,
Christopher Polking, Judge.


        A defendant appeals his conviction for first-degree murder.  **AFFIRMED.**


        Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines,
for appellant.

        Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney
General, for appellee.


        Considered by Bower, C.J., and Vaitheswaran, Tabor, Greer, Schumacher,
and Chicchelly, JJ.

**SCHUMACHER, Judge.**

Justin Hurdel appeals his conviction for first-degree murder. He claims the district court should have suppressed statements he made during a police interrogation as well as text messages obtained from his phone. He also raises evidentiary claims related to text messages from his deceased ex-wife. Finally, he contends there was insufficient evidence to support his conviction. We conclude the statements Justin made to police and text messages were properly admitted into evidence. Lastly, we determine sufficient evidence supports Justin's conviction. Accordingly, we affirm.

## I.      Background Facts & Proceedings

Based on the testimony and exhibits at trial, a reasonable jury could conclude the following. Justin and Maggie Hurdel married on January 1, 2018, a day after Justin was released from prison on a previous conviction. Their relationship quickly soured. Maggie filed for divorce in May 2019, although that case was dismissed because of Maggie's failure to perfect service of the petition on Justin. Maggie filed for divorce a second time in February 2020, but the couple reconciled. Maggie filed for divorce a third time on July 27, 2020.

By all accounts, Justin opposed the divorce. But to conclude the proceedings, he went to Maggie's attorney's office and signed a stipulation on August 5. Maggie's attorney testified that Justin was emotional and left his wedding ring on the table when he exited the law office. Following his meeting with the attorney, Justin went to Robert Baker's garage. Baker was friends with both Justin and Maggie. Maggie was already present, along with another mutual friend, Gary Spencer. Baker and Spencer were working on Maggie's truck. Justin

informed Maggie that he had signed the divorce stipulation. According to Justin, her response was "smug" and he felt like she was saying, "whoopty-fucking-do." According to Justin, he could not handle Maggie's response and angrily left the garage. Justin punched the wall of the garage as he exited.

Justin returned to his mother's home, where he was living, and retrieved a sawed-off shotgun. He also changed into camouflage shorts and a camouflage raincoat. He later testified that he wore the raincoat to conceal the shotgun. According to Justin, he could see a round was chambered but did not check the magazine. The shotgun was loaded with four shells. Justin returned to Baker's garage, but Maggie and Baker had left to buy car parts. Spencer informed Justin that they would return shortly. Justin went back into the garage, positioned himself away from the door and behind the truck, and waited for their return. Justin testified that he intended on killing himself in front of Maggie.

Once Maggie and Baker returned, Maggie and Justin exchanged words. At the time, Baker and Spencer were near the front of the vehicle, working on the truck's battery. Maggie and Justin were at the rear of the truck. Accounts differ as to the exact words spoken between the two. According to Baker, Justin asked Maggie, "Are you scared now?" Spencer, in contrast, heard Justin tell Maggie, "My life's over. You ruined my life." Justin informed police that he had told Maggie that his own life was over, and now Maggie's was too. Just after the exchange of words, Maggie turned to walk away. Justin's shotgun fired, striking Maggie on the backside of her left shoulder, killing her. Justin contends the gun went off prematurely. Later testing by a Department of Criminal Investigation (DCI) criminalist concluded that the gun functioned properly.

Just after firing the weapon, Justin moved over to a step-stool to brace the shotgun so he could kill himself. Justin again contended the weapon went off prematurely, hitting his nose and face. He believed the weapon "exploded," and fled the scene in his car. The shotgun's stock was broken into several pieces.

Justin drove his vehicle and abandoned it near the waste water treatment facility outside of town. A couple found his cell phone—broken in two, smeared with blood, and missing the battery—on the side of a road. After purchasing a new battery, police retrieved text messages between Justin and Maggie, without a warrant. The police searched for Justin for roughly seventeen hours, executing search warrants on Justin's vehicle and his mother's home. Ultimately, police received information that Justin may be hiding near a rural home about four-and-one-half miles from his car and three-and-one-half miles from the crime scene. The area was covered in thick brush. He was discovered by law enforcement with the use of a K-9.

After his arrest, Justin was transported to an area hospital to treat the facial wounds he sustained during his attempted suicide. Upon discharge, the "ok-to-jail" release noted that Justin needed to be transferred to a hospital in Iowa City "ASAP." Justin was brought to the Webster County Law Enforcement Center (LEC), where he was interviewed by Detective Larry Hedlund. During the interview, Justin made several incriminating statements. Following the interview, Justin was taken to Iowa City for further treatment.

Justin was charged with first-degree murder. Before trial, he moved to suppress statements he made to the police during his interview at LEC, claiming he had not voluntarily waived his right to counsel. He also moved to suppress the

text messages from his phone. The court denied the motion. The text messages were admitted at trial, subject to evidentiary objections by Justin.

At trial, Justin claimed to have accidentally killed Maggie and then botched his suicide attempt. The jury found Justin guilty of first-degree murder, in violation of Iowa Code sections 707.1 and .2 (2020). Justin appeals.

## II. Discussion

Justin raises several claims on appeal. First, he contends his statements to law enforcement during the interrogation at LEC violated his *Miranda* right to counsel. He also claims his rights against unreasonable search and seizures were violated when law enforcement obtained data from his cell phone. He contests the admissibility of messages Maggie sent him in the month right before the shooting. Finally, he claims there was insufficient evidence to support his first-degree murder conviction.

### A. Motion to Suppress Justin's Statements to Police

Justin contends the use of his statements to law enforcement violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution, and article I, sections 9 and 10 of the Iowa Constitution, because he did not knowingly and voluntarily waive his right to have counsel present for questioning. In particular, Justin claims law enforcement improperly reinitiated questioning after he invoked his right to have counsel present. He also alleges that his statements were involuntary.[1] *See State v. Hodges*, 326 N.W.2d 345, 347 (Iowa 1982)

---

[1] "'[V]oluntariness' for . . . due process purposes and *Miranda* purposes are identical." *State v. Tyler*, 867 N.W.2d 136, 174 (Iowa 2015) (alterations in original) (quoting *State v. Countryman*, 572 N.W.2d 553, 559 (Iowa 1997)). Thus, we address both of Justin's claims together.

(highlighting that voluntary waiver of rights and voluntary statements were distinct issues). We review constitutional claims de novo. *State v. Harris*, 741 N.W.2d 1, 5 (Iowa 2007).

As an initial matter, we must determine whether Justin properly invoked his right to counsel during the interview. Once a defendant invokes the right to have counsel present, they cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). But in order to exercise such right, the invocation "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (citation omitted). The statement must not be "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Id.*; *see also Harris*, 741 N.W.2d at 6 ("Officers have no obligation to stop questioning an individual who makes an ambiguous or equivocal request for an attorney.").

Justin made two statements that he claims were invocations for his right to counsel: (1) "I just want to see what kind of court-appointed I get," and (2) "How about we get my court-appointed lawyer rolling, then we'll go to Iowa City, and then I'll talk your ear off."[2] The detective questioning Justin ceased the interview

---

[2] For the sake of readability, we will refer to these statements as Justin's first and second statements, respectively.

following the second statement, although the interview began again roughly ten minutes later.

Justin's first statement was insufficient to invoke his right to counsel. Justin had experience with the criminal-justice system. His statement indicates a knowledge that he would eventually receive counsel, but is ambiguous as to whether he was demanding counsel at the time. The statement merely includes a reference to an attorney at some future time; the statement fails to *request* an attorney.

Justin's second statement is an invocation of his right to counsel.[3] Indeed, Detective Hedlund interpreted it as an unambiguous invocation. Unlike the first statement, Justin set out the process by which he believes the interview will proceed—he receives the support of an attorney, then obtains medical treatment, and only then will he answer questions. We find this statement similar to *Harris*, in which the defendant informed police that he did not want to talk about the events unless it was with an attorney present. *See Harris*, 741 N.W.2d at 7 (finding that the defendant's statement, "I don't want to talk about it. We're going to do it with a lawyer. That's the way I got to go," was sufficient to invoke his right to counsel). While Justin phrased his invocation in somewhat colloquial language—"*how about we get my court-appointed lawyer rolling*"—that does not preclude the statement from being interpreted as an invocation of his rights. "[A] suspect need not 'speak with the discrimination of an Oxford don.'" *Id.* (quoting *Davis*, 512 U.S. at 459). Justin's second statement invoked his right to counsel.

---

[3] In the roughly three minutes between his first and second statement, Justin did not make any incriminating statements.

Because Justin invoked his right to counsel via his second statement, Detective Hedlund properly stopped the interview at that time. The question remains, however, whether Justin reinitiated a conversation with the police. *See Edwards*, 451 U.S. at 485. Under these circumstances, a valid waiver requires the defendant to "evince[] a willingness and a desire for a generalized discussion about the investigation." *Harris*, 741 N.W.2d at 6 (alteration in original) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)).

Here, we have little difficulty in determining Justin reinitiated questioning. Roughly ten minutes after questioning ceased, Detective Hedlund brought in water and snacks for Justin. Detective Hedlund then asked if Justin wanted a breakfast sandwich. Justin responded in the affirmative. As Detective Hedlund was turning to walk out of the room, Justin, unprompted, stated, "we can talk, you can ask questions or whatever . . . . I'll do whatever I can." Such a statement expressed a willingness to answer further questions. *See Bradshaw*, 462 U.S. at 1046 (noting that the defendant's inquiry into what was going to happen to him expressed "a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship").

Contrary to Justin's contention that the offer of food and water was merely a ploy to reinitiate questioning, we find that such questions were "routine incidents of the custodial relationship" that are insufficient to count as further questioning. *See Bradshaw*, 462 U.S. at 1045. Offering food and water, particularly when Justin had been on the run for the previous seventeen hours, was not an attempt to "cajole" the defendant into waiving his rights. *See Harris*, 741 N.W.2d at 7 (finding

that questions like, "You don't trust us enough to do it without a lawyer?" were impermissible attempts to keep the questioning going).

Having determined that Justin invoked his right to an attorney and then reinitiated questioning, we must determine whether his waiver of rights was knowing and voluntary. "For a waiver to be made voluntarily, the relinquishment of the right must have been voluntary, meaning it was the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception." *Tyler*, 867 N.W.2d at 174 (quoting *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009)). We examine the totality of the circumstances, including the

> defendant's age; whether defendant had prior experience in the criminal justice system; whether defendant was under the influence of drugs; . . . whether defendant was mentally "subnormal"; whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant's physical and emotional reaction to interrogation; whether physical punishment, including deprivation of food and sleep, was used.

*Id.* at 175 (quoting *State v. Payton*, 481 N.W.2d 325, 328-29 (Iowa 1992)). "The State has the burden to prove by a preponderance of the evidence that [the defendant] voluntarily waived [his] *Miranda* rights." *Id.*

We determine Justin's waiver was knowing and voluntary. Justin is an adult who has experience with the criminal justice system. He told Detective Hedlund that he had used methamphetamine the previous night, but he consistently understood the questions posed to him and answered coherently. Justin was only interrogated for roughly ninety minutes, and there were breaks when he invoked his right to an attorney and later when he was allowed to speak with his mother. Law enforcement did not physically punish him and did not use deceptive

practices. For instance, upon reinitiating the questioning, Justin and Detective Hedlund set up a system where Justin could say "lawyer" or "pass" to questions he did not want to answer, after which Detective Hedlund would move on. Justin utilized that system multiple times and Detective Hedlund promptly moved on to a new question each time.

Justin takes particular issue with his physical state during the questioning, which included drainage from his wounds and some level of discomfort caused by the gunshot wound to his face and staying outside all night. Justin was only subjected to questioning after he was cleared to go to jail by medical personnel at the Fort Dodge hospital. It is true that a doctor's note indicated he needed to go to Iowa City for further treatment "ASAP," but that statement was only made after the note expressed that Justin was "ok to jail." The police did not withhold medical treatment to coerce him into answering questions. As Detective Hedlund told Justin towards the end of the interrogation, they were waiting for a judge to arrive for Justin's initial appearance. The wait on the judge, not on Justin answering questions to the police's satisfaction, caused the delay in going to the hospital. And, as noted above, police provided food and water, including snacks and a breakfast sandwich. Given the totality of the circumstances, Justin validly waived his *Miranda* rights.

**B.      Motion to Suppress Justin's Phone Data**

Justin claims the district court should have suppressed evidence found on his phone[4] because police obtained the data without a warrant in violation of the

---

[4] Police only extracted text messages saved on Justin's phone. They did not access other information, such as data saved on the cloud.

Fourth Amendment and article I, section 8 of the Iowa Constitution.[5] The State counters by suggesting Justin abandoned his phone, thus allowing the warrantless search. "Because this case concerns the constitutional right to be free from unreasonable searches and seizures, our review of the district court's suppression ruling is de novo." *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011).

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has [a reasonable] expectation of privacy in the place searched . . . ." *United States v. Crumble*, 878 F.3d 656, 659 (8th Cir. 2018) (alterations in original) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). A defendant does not generally have a reasonable expectation of privacy in abandoned property. *Id.* "The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [their] reasonable expectation of privacy . . . ." *Id.* (final alteration in original) (quoting *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997)). "A finding of abandonment depends on the totality of the circumstances, with 'two important factors [being] denial of ownership and physical relinquishment of the property.'" *Id.* (alteration in original) (quoting *Tugwell*, 125 F.3d at 602). We consider objective facts, not the subjective intent of the defendant. *Id.*

---

[5] Justin does not suggest we should interpret his claims under the Fourth Amendment and article I, section 8 under different tests. However, our supreme court recently noted that "it is no longer tenable to follow federal precedents in lockstep" with our own constitutional right against unreasonable searches. *State v. Wright*, 961 N.W.2d 396, 412-13 (Iowa 2021). Thus, while we give "[r]espectful consideration of the Supreme Court's precedents," *id.*, we analyze Justin's claims under the Iowa constitution independently from his claims under the federal constitution.

Justin removed the battery and broke the phone in two.[6]  He then threw it out of a moving car onto the side of the road while trying to flee the area.  Such behavior suggests that Justin intended to abandon the property.  Moreover, leaving the inoperable phone in a remote location is strong evidence of physical relinquishment because he would likely be unable to return and retrieve it.  While Justin asserts that *Riley v. California*, 573 U.S. 373 (2014), protects his privacy interest in the phone even after he abandoned it, federal courts have held that case inapposite to the issue.  *Crumble*, 878 F.3d at 660 ("*Riley*'s holding is limited to cell phones seized incident to arrest.  *Riley* was explicit that 'other case-specific exceptions may still justify a warrantless search of a particular phone.'  Other courts have found abandonment to be one such exception." (internal citation omitted)).

Similarly, the warrantless search of Justin's phone did not violate article I, section 8 of the Iowa Constitution.  "Abandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property."  *Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995) (en banc).

Justin showed an intent to forego all right to the phone by removing the battery and throwing the phone out of a moving vehicle.  Justin's actions are similar to *State v. Bumpus*, in which the defendant challenged the search of a pouch he threw over a fence while facing arrest.  459 N.W.2d 619, 625 (Iowa 1990).  Our supreme court held that the defendant lacked a reasonable expectation of privacy

---

[6] The phone was broken into a front and back half.

in the pouch because his actions evinced an intent to "place the property outside the realm of his control" in order to "no longer . . . be associated with the property." *Id.* Similarly, Justin threw the phone away to avoid detection by police—he no longer wanted to be associated with the phone that could be used to track him. Further, Justin's attempted destruction of the phone rendered it inoperable for everyone—without buying a new battery, no one could have used the phone. Thus, the property was in the same state of operability no matter who found it— including Justin himself—making it the kind of ownerless property subject to the abandonment exception for searches. The court properly denied Justin's motion to suppress.

### C. Text Message Evidentiary Claims

Justin contests the admissibility of several text messages Maggie sent him. We generally review evidentiary claims for an abuse of discretion. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021). We review hearsay claims for correction of errors at law. *Id.* The contested messages and the grounds for the objections are as follows:

| Exhibit | Content | Objections |
|---------|---------|------------|
| T-104 | I'm not putting up with harassing demands from my absentee husband | Hearsay |
| | I walked away from an unhealthy relationship | Hearsay & Character Evidence |
| | I deserve better | Hearsay |
| T-106 | I would love to help you I would love to be in your life but every time I try to be you don't let me in and by the end of the night if I say something you don't like you block me so [I don't know] how I'm ever suppose to be in your life let alone stay in it | Hearsay |

|  | You don't stand up for me and you don't stand up for us soon as anybody comes around us you turn on me so maybe you need to figure things out in your heart first before you come at me like this again | Hearsay & Relevance |
|---|---|---|
| T-107 | Have you stayed faithful to me?  Or have you been intimate with someone else? | Hearsay |
| T-111 | Get some help [redacted] we will try again | Hearsay & Character Evidence |
| T-113 | I have a new understanding<br>I wish you could feel the tranquility I feel | Hearsay |

Iowa Rule of Evidence 5.801(c) defines hearsay as an out of court statement used to prove the truth of the matter asserted.  Maggie made the statements outside of court—the messages were sent in the weeks before her death.  Justin contends the messages were used to prove the truth of the matter asserted; that is to say, for example, to prove that Maggie really did have a "new understanding."[7]

We disagree.  The messages were not admitted to prove the truth of what Maggie was asserting.  The State was not trying to prove that Maggie had a new understanding, or wished that Justin could feel the tranquility she felt, or truly deserved better than Justin.  Rather, the messages were used to provide context for Justin's responses.  For instance, Justin responded to Maggie's message asserting, "I deserve better," stating, "No [you] actually deserve a lot f****** worse."[8] Justin's response would make little sense without Maggie's message.  Similarly,

---

[7] We note that Justin correctly points out the messages were not admissible under the "Completeness Doctrine," contrary to the district court's belief.  *See* Iowa R. Evid. 5.106.  That rule only allows the adverse party to move for the admission of statements that ought to be included with others already admitted.  *Id.*  Here, the State sought to admit both Justin's and Maggie's messages.

[8] The system used to extract Justin's phone data censors cursing, resulting in words including asterisks.

Justin responded to Maggie's inquiry over whether he had stayed faithful to her, stating, "So beware the next time you accuse me of that s*** because it could be the f****** last." The message loses its relevance and importance without Maggie's message. Thus, the messages were not being used for the truth of the matter asserted and were not hearsay.[9] Even if the messages were being used for the truth of the matter asserted, the messages are admissible under the then-existing mental state exception because they reflect Maggie's feelings when she wrote the messages. *See* Iowa R. Evid. 5.803(3).

Even when evidence is non-hearsay, it must still be relevant in order to be admitted. *See* Iowa R. Evid. 5.402. Our supreme court has held that "the defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations." *State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004). Justin's intent was the only issue at trial. Thus, the history of Justin and Maggie's emotional relationship was highly relevant to what his intent was on the day of the shooting.

Finally, we also find that even if the evidence was inadmissible, any error was harmless.[10] *See State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014) ("[We]

---

[9] We also note that the court suggested that a limiting instruction could be included, directing the jury not to use the messages for the truth of the matter asserted. Justin declined the use of such instructions.

[10] Justin's claims involving the improper admission of character evidence were limited to a single paragraph identifying rule 5.404(a) and (b) as the grounds for error. It did not explain the legal framework, nor explain how the contested messages were, in fact, character evidence or improper. Such a conclusory claim

will reverse the admission of hearsay evidence as prejudicial unless the contrary is shown."). It was uncontested at trial that Maggie and Justin had a tumultuous relationship. Exhibits included Maggie's two prior petitions for dissolution. Baker and Spencer, close friends of both Maggie and Justin, testified to the couple's rocky relationship. And Justin himself conceded that he would respond emotionally and inappropriately at times, including two instances in the month leading up to the shooting where Maggie called the police over occurrences of abuse. Thus, the messages did not provide any information the jury did not already have access to. Any error was harmless.

### D.     Sufficiency of Evidence

Justin claims there is insufficient evidence to support his conviction. In particular, he alleges there is insufficient evidence that he had the requisite intent for first-degree murder.

> Sufficiency of evidence claims are reviewed for . . . correction of errors at law. In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpatory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

*State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014) (alterations in original) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)).

---

is insufficient to prove Justin's contentions. *See State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002).

In order to convict Justin, the jury had to find that he "acted with malice aforethought," and "acted willfully, deliberately, premeditatedly, and with a specific intent to kill Maggie."[11]  As defined by the jury instructions, which in relevant part were not objected to at trial:

> "Willful" means intentional or by fixed design or purpose and not accidental.
> "To deliberate" is to weigh in one's mind, to consider, to contemplate, or to reflect.
> "Premeditate" is to think or ponder upon a matter before acting.
> "Specific intent" means not only being aware of doing an act and doing in voluntarily, but in addition, doing it with a specific purpose in mind.
> "Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed.  It does not have to exist for any particular length of time.

The instructions also noted that "[i]f a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice [aforethought], premeditation, and specific intent to kill."  The jury was also instructed that a firearm, "by law, is a dangerous weapon."

We have little difficulty concluding that sufficient evidence supports the conclusion that Justin intended to kill Maggie.  First, the timeline of the events indicates that he was upset about the divorce and Maggie's seeming indifference to it.  Justin told Detective Hedlund that Maggie's response was smug and "he could not take it."  After leaving Baker's garage—he was upset enough he punched the wall on his way out—he returned to his house to retrieve a gun and put on

---

[11] The jury also had to find that Justin shot Maggie, and that she died as a result of the shot.  He does not contest those elements.

camouflage pants and a jacket. The time it took to retrieve the gun and wait for Maggie's return provided ample opportunity to deliberate about his actions. Despite professing to only wanting to kill himself, he waited for Maggie to return— positioning himself in the back of the garage where Maggie would not see him until she fully entered the garage. When asked if he told Maggie that his life was over now, and so was hers, he responded, "yes, yes, fuck yes." This is consistent with Baker and Spencer's testimony. He shot her in the back as she turned to walk away from him. This is consistent with the State's theory that he was angry about the divorce and Maggie's response, and contradicted his story that Justin wanted her to see him kill himself. He also told Detective Hedlund that he knew what he was doing was wrong when he did it. Taken together, a jury could reasonably infer that Justin intended to shoot Maggie because he was angry with her over the divorce, and had the time to deliberate on his actions.

Justin's flight from the crime scene is also indicative of guilt. "It is well-settled law that the act of avoiding law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself." *State v. Wilson*, 878 N.W.2d 203, 211 (Iowa 2016). Such evidence of guilt depends on four inferences:

> (1) from the defendant's behavior to avoidance of apprehension, (2) from avoidance of apprehension to consciousness of guilt, (3) from consciousness of guilt to consciousness of guilt concerning the crime charged, and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Id.* at 212-13. Ultimately, "[a]n act of flight has only marginal probative value as circumstantial evidence of guilt unless the act itself and the surrounding circumstances 'reasonable justify an inference that it was done with a

consciousness of guilt and in an effort to avoid apprehension or prosecution based on that guilt.'" *Id.* at 214 (citation omitted).

Here, the chronology of events strongly suggests Justin was fleeing apprehension based on his consciousness of guilt. First, Justin arrived wearing camouflage outerwear, suggesting an intent to avoid detection. Witnesses testified that he drove away at a high rate of speed. *See id.* ("Evidence establishing the immediacy of flight relevant to other significant events in the case ordinarily constitutes the best available evidence from which to infer consciousness of guilt for the particular crime charged."). He then abandoned his vehicle and discarded his phone, making it more difficult for police to track him. He was discovered in a rural area with thick brush seventeen hours later. After being arrested, Detective Hedlund told Justin he was being charged with first-degree murder, to which Justin responded, "I know." This further demonstrates he knew he had committed a crime and was avoiding detection because of it. Thus, the jury could reasonably infer guilt based on Justin's actions after the shooting.

The jury was also entitled to presume Justin had the requisite malice aforethought, premeditation, and specific intent based on his use of a dangerous weapon. It was undisputed at trial that Justin was using a shotgun, and that such constituted the use of a dangerous weapon.

Additionally, Justin's theory that the gun went off prematurely was confused and contradicted throughout trial. He testified that he knew there was one round in the chamber when he retrieved the shotgun, but testified that the gun went off when he pumped the shotgun to chamber a shell. He struggled to explain why he never told police the shooting was an accident. Similarly, he could not explain why

he never tried to kill himself during the seventeen hours between the shooting and his arrest. Neither could he explain why the gun misfired twice for him but worked properly during DCI testing. Given the implausibility of his own story and the ample evidence that supports a finding that Justin planned to kill Maggie, there is sufficient evidence to support his conviction.

**III.    Conclusion**

The court properly admitted evidence from Justin's interview with police and his cell phone. Additionally, any alleged error concerning the admission of the text messages would be harmless. Sufficient evidence existed to support Justin's conviction for first-degree murder.

**AFFIRMED.**